**Carl J. BATTAGLIA, M.D., P.A. and Tommy A. Polk, M.D., P.A., Appellants,**

v.

**Lisa Jones ALEXANDER, Individually and As Natural Representative of the Estate of Mark G. Alexander, Deceased, and James Alexander, Individually, and Ruby Alexander, Individually, Appellees.**

No. 14–00–00428–CV.

Court of Appeals of Texas, Houston (14th Dist.).

April 25, 2002.

Rehearing Overruled Sept. 19, 2002.

Jack G. Carnegie, Houston, for appellants.

Jim M. Perdue, Kevin Dubose, Houston, for appellees.

Panel consists of Justices ANDERSON, HUDSON, and FROST.

## OPINION

KEM THOMPSON FROST, Justice.

In this wrongful death case arising from anesthesia malpractice, appellants Carl J. Battaglia, M.D., P.A. and Tommy A. Polk, M.D., P.A. (collectively, the "Professional Associations") assert that they owed decedent Mark G. Alexander no duty, that there was no evidence of their negligence, and that there was no evidence and no adequate legal basis to support the vicarious-liability theories against them based on the acts of Dr. Laverta Crowder and Nurse Anesthetist Constance Cernosek. The Professional Associations also argue the trial court erred in calculating prejudgment interest and in holding them jointly and severally liable. We affirm the trial court's judgment.

### Factual and Procedural Background

The Professional Associations were formed as corporate vehicles for the medical practices of two anesthesiologists, Drs. Carl J. Battaglia and Tommy A. Polk. The Professional Associations entered into an exclusive contract with TOPS Surgical Specialty Hospital ("TOPS"). Under this contract, the Professional Associations agreed to provide anesthesia services at the surgical hospital located at 17080 Red Oak Drive, Houston, Texas ("Hospital"). The contract obligated the Professional Associations to "operate and staff" the Hospital's Department of Anesthesia. In the contract, the Professional Associations agreed "to provide all medical, technical, education, research, quality control and other customary services necessary or appropriate for the operation of a full service anesthesia program in the [Hospital]." The Professional Associations also promised that the anesthesia services they provided under their contract with TOPS would comply with applicable governmental, legal, and professional standards.

Doctors perform approximately 7,000 surgeries each year in the Hospital's seven operating rooms. To fulfill their obligations under their contract with TOPS, the Professional Associations use certified registered nurse anesthetists ("Nurse Anesthetists") to perform anesthesia services. The evidence at trial showed that the Professional Associations selected, trained, assigned, and supervised the Nurse Anesthetists. The evidence also showed that the Professional Associations were responsible for assuring that the Nurse Anesthetists complied with the policies and procedures promulgated by the Hospital, the Anesthesia Department, and the American Society of Anesthesiologists.

TOPS collected all professional fees associated with the Hospital's Anesthesia Department. TOPS maintained a separate account for these fees and paid each of the Professional Associations $360,000 annually—an aggregate of $720,000 per year—for the services provided by the anesthesiologists under the contract. In addition, TOPS also paid each of the Professional Associations one-third of the "Anesthesia Profits," which is the amount, if any, by which the gross revenues from

all anesthesia services, with a few adjustments set forth in the contract, exceeds the sum of the following: (1) the $720,000 mentioned above and (2) the salaries, benefits, and other direct costs of the Nurse Anesthetists and all supplies, promotional expenses, and other costs directly attributable to the operation of the Hospital's Anesthesia Department (but not including any of TOPS's general overhead expense) for the year in question. TOPS retained the other one-third of the "Anesthesia Profits."

On September 19, 1997, Mark Alexander, a forty-year-old man, reported to the Hospital for routine arthroscopic shoulder surgery, to be performed as an outpatient procedure. Dr. Laverta Jane Crowder, an anesthesiologist, introduced herself to Mark and told him that she was with the Anesthesia Department. Dr. Crowder worked at the Hospital under an agreement that she had with Drs. Battaglia and Polk. Mark asked Dr. Crowder questions about the anesthesia to be used in his surgery. Dr. Crowder answered Mark's questions; however, she did not tell Mark that his anesthesia would be administered by a Nurse Anesthetist without a supervising anesthesiologist in the room. After the surgical procedure began, Dr. Crowder left the operating room. Consequently, Nurse Anesthetist Constance Cernosek was the only person from the Anesthesiology Department present in the operating room during Mark's surgery. Dr. Crowder testified she could not recall having any other duties or responsibilities at that time, and she could have remained in the operating room.

An expert anesthesiologist, Dr. Robert Kirby, testified that Nurse Cernosek made several grave errors during and in preparation for Mark's surgery. First, she inserted the endotracheal tube to an excessive depth. She also inserted the esophageal stethoscope—used to monitor the patient's breathing and heart sounds—into Mark's left lung rather than into his esophagus. Dr. Kirby testified that this would cause inadequate ventilation to Mark's lungs. Another expert anesthesiologist, Dr. Roy Sheinbaum, also testified that the placement of the esophageal stethoscope into Mark's right lung could cause inadequate ventilation.

An expert cardiologist, Dr. Robert Fromm, testified that, during surgery, Mark had progressive bradycardia, an abnormally slow beating of the heart, which is a condition that is consistent with inadequate ventilation. This condition can lead to cardiac arrest. According to Dr. Fromm, if Mark was in good health before the operation and if he had been well-ventilated during surgery, he would have survived a sudden cardiac arrest during the surgery.

To record the time during Mark's surgery, Nurse Cernosek used the operating room clock. The last documented heart rate for Mark on his anesthesia record was at 10:25 a.m. However, based on the operating room clock, at 10:42 a.m.[1], the medical team first became aware that Mark had no pulse and was in cardiac arrest. Nurse Cernosek failed to record Mark's heart rate during this seventeen-minute period.

In order to alert the anesthetist to potential problems, the vital-sign monitors have alarms that are supposed to sound when the recorded vital signs are outside of safe parameters. Nurse Cernosek testified that the alarms on Mark's vital-sign monitors never went off. No one else

---

1. Unless otherwise stated, all times given in this opinion are based on the operating room clock.

present could remember hearing any monitor alarms sound. Dr. Lewis Coveler, an expert anesthesiologist called by appellants, and Dr. Kirby testified that these alarms should have sounded on several occasions. Drs. Coveler and Kirby both testified that the failure of these alarms to go off indicated that either the parameters for these alarms had been set too broadly or the alarms had never been activated.

During Mark's surgery, the surgeon, Dr. Mark Stuart, noticed Nurse Cernosek fiddling under the drape separating the surgical field from Mark's head. When Dr. Stuart asked what she was doing, Nurse Cernosek indicated the patient was having ventilation problems. Dr. Stuart immediately withdrew his instruments and turned Mark over. Mark's upper body and thighs already had turned blue from oxygen deprivation.

Dr. Crowder was summoned to the operating room, and Dr. Battaglia came along as well. These doctors, along with the nurses, began emergency resuscitation efforts. By that time, however, Mark already had been deprived of adequate blood flow to the brain for at least ten minutes and possibly as long as fourteen minutes. Dr. Coveler, an expert called by the Professional Associations, testified that a one-minute delay by Nurse Cernosek in identifying Mark's cardiac arrest would be negligent. At 10:53 a.m., the doctors succeeded in establishing blood pressure and a pulse. According to Dr. Kirby, by that time, Mark had been without sufficient blood flow to his brain for twenty to twenty-four minutes. Mark never regained consciousness. He died on October 3, 1997. An autopsy showed that Mark's death was due to brain damage resulting from a lack of oxygen.

Mark's wife, Lisa Jones Alexander, individually and as representative of Mark's estate, and James and Ruby Alexander, Mark's parents (collectively, the "Alexander Family") filed this wrongful death and survival action against TOPS, Nurse Cernosek, Dr. Crowder, Dr. Battaglia, Dr. Polk, the Professional Associations, and Red Oak Anesthesia Associates. Before trial, the Alexander Family settled with TOPS and Nurse Cernosek. The non-settling defendants elected a dollar-for-dollar settlement credit.

At the close of the evidence, the trial court granted a directed verdict in favor of Red Oak Anesthesia Associates and Dr. Polk. In a unanimous verdict, the jury found, among other things:

- Mark was not the patient of Dr. Battaglia with respect to the anesthesia care rendered to him on September 19, 1997 (the date of the surgery);
- The negligence, if any, of Dr. Battaglia, individually, and TOPS did not proximately cause injury to Mark;
- The negligence of Nurse Cernosek, Dr. Crowder, and the Professional Associations proximately caused injury to Mark;
- Nurse Cernosek and Dr. Crowder were each 30% negligent, and each Professional Association was 20% negligent;
- Nurse Cernosek was an employee of the Professional Associations;
- There was an agency relationship between "Carl J. Battaglia M.D., P.A. or Tommy Polk, M.D., P.A." and Dr. Crowder;
- On September 19, 1997 (the date of the surgery), the Professional Associations were engaged in a joint venture;
- Lisa Alexander sustained damages of $1,080,000 in the past and will in reasonable probability sustain $1,080,000 in damages in the future;
- Ruby Alexander sustained damages of $180,000 in the past and will in rea-

sonable probability sustain $180,000 in damages in the future;

- Vernon Alexander sustained damages of $180,000 in the past and will in reasonable probability sustain $180,000 in damages in the future.

After applying the settlement credit, the trial court signed a final judgment against the Professional Associations and Dr. Crowder based on their respective percentages of negligence. The judgment also stated that each Professional Association was jointly and severally liable for the entire judgment. The trial court's judgment calculated prejudgment interest based on the full amount of past damages found by the jury, without any reduction for the settlement credit. The total prejudgment interest awarded against the Professional Associations was $367,498.05.

All three judgment debtors appealed; however, Dr. Crowder later paid the full amount of the judgment against her and dismissed her appeal, leaving the Professional Associations as the only remaining appellants.

## ISSUES PRESENTED

The Professional Associations assert the following issues on appeal:

- Did the trial court err in submitting jury questions as to the direct liability of the Professional Associations because this theory was not pleaded or supported by any evidence and because this question creates a duplicative submission resulting in double liability for the Professional Associations? (Issues 1 and 2)
- Did the Professional Associations have a duty to Mark Alexander as a matter of law? (Issues 3 and 4)
- Was there any evidence of the standard of care applicable to the Professional Associations? (Issues 5 and 6)

- Was there any evidence that the Professional Associations were negligent? (Issues 7 and 8)
- Can the Professional Associations be liable for negligence when their doctor-owners were not found to be negligent? (Issues 9 and 10)
- Did Dr. Crowder's payment of the judgment against her render moot the jury's finding that she was the Professional Associations' ostensible agent and discharge the Professional Associations from any liability based on that finding? (Issue 11)
- Did the trial court err in holding the Professional Associations vicariously liable for Dr. Crowder's negligence based on the jury's answer to question number six, relating to her alleged status as the Professional Associations' ostensible agent? (Issue 12)
- Did the trial court hold the Professional Associations vicariously liable for the negligence of settling-party Nurse Cernosek and, if so, was it error to do so? (Issue 13)
- Did the trial court err in holding the Professional Associations liable for each other's negligence based on a finding that they were engaged in a joint venture? (Issue 14)
- Did the trial court err in imposing joint and several liability on the Professional Associations? (Issue 15)
- Under the Medical Liability and Insurance Improvement Act, did the trial court err in failing to allocate any of the settlement credits to the amount found as past damages before calculating prejudgment interest and in awarding prejudgment interest on past damages for which defendants were not held liable in the judgment? (Issue 16)

## STANDARD OF REVIEW

When reviewing a no-evidence challenge, we may consider only the evidence and reasonable inferences therefrom that support the challenged findings, and we disregard all evidence and inferences to the contrary. *Texarkana Memorial Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 838 (Tex.1997). We may sustain a no-evidence challenge if the record reveals: (1) the complete absence of a vital fact; (2) rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; *or* (4) the evidence established conclusively the opposite of the vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex.1998). More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997).

## ANALYSIS

1. ***Did the trial court err in submitting jury questions as to the direct liability of the Professional Associations because this theory was not pleaded or supported by any evidence and because this question creates a duplicative submission resulting in double liability for the Professional Associations?***

In their first and second issues, the Professional Associations assert the trial court reversibly erred in submitting question number two, which inquired about the negligence of the Professional Associations separate and apart from the negligence of Drs. Battaglia and Polk. The Professional Associations assert this submission was error because the Alexander Family did not plead a theory of liability for the Professional Associations that would go beyond the failure of Drs. Crowder, Polk, and Battaglia to exercise ordinary care in the practice of anesthesiology and the failure of Nurse Cernosek to exercise ordinary care in the practice of nursing, i.e., direct liability. The Professional Associations also assert that jury question number two's submission of separate issues for the Professional Associations' negligence was improper because there was no evidence of the Professional Associations' negligence and because this question created a duplicative submission resulting in double liability for the Professional Associations.

The Alexander Family did plead direct-liability theories against the Professional Associations. The Professional Associations' argument to the contrary is incorrect. In addition, for the reasons explained in section 3, *infra*, we also reject the Professional Associations' argument that there was no evidence of their negligence under a direct-liability theory. As to the Professional Associations' argument that question number two's submission of separate issues for their negligence created a duplicative submission and resulted in double liability, we find they failed to preserve error on this issue and thus waived their complaint.

In objecting to question number two, the Professional Associations stated:

> The defendants object to the submission of Carl Battaglia, MD, PA, and Tommy Polk, MD, PA, because there's been no evidence of any negligence on the part of the professional associations. The only allegations that have been made are those of vicarious liability.

The Professional Associations argue this objection preserved error on their duplicative-submission argument. We disagree. To preserve error, it was incumbent on the

Professional Associations to specifically designate the alleged error and the grounds for their objection. *See* TEX. R.APP. P. 33.1; TEX.R. CIV. P. 274; *Keetch v. Kroger Co.,* 845 S.W.2d 262, 267 (Tex. 1992). Because their objection did not distinctly identify their duplicative-submission argument, the Professional Associations have not preserved error as to this argument. Accordingly, we overrule the Professional Associations' first and second issues.

### 2. Did the Professional Associations preserve error as to their third, fourth, fifth and sixth issues?

In their third and fourth issues, the Professional Associations assert that, as a matter of law, they owed no duty to the Alexander Family. In their fifth and sixth issues, the Professional Associations argue that there was no evidence of the standard of care applicable to them. In order to assert these issues on appeal, the Professional Associations were required to raise these issues in the trial court by one or more of the following methods: (1) a motion for directed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the question to the jury; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a motion for new trial. *Steves Sash & Door Co., Inc. v. Ceco Corp.,* 751 S.W.2d 473, 477 (Tex.1988); *United Parcel Serv., Inc. v. Tasdemiroglu,* 25 S.W.3d 914, 916 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). The Professional Associations have not cited any part of the appellate record where they claim to have preserved error as to their third, fourth, fifth, and sixth issues. We have carefully reviewed the Professional Associations' motions for directed verdict, their responses in opposition to the Alexander Family's motion to enter judgment (which we presume for the sake of argument are motions

for judgment notwithstanding the verdict or motions to disregard the jury's answer to a vital fact question), their objections to the jury charge, their motion to modify the judgment, and their motion for new trial. We have found nothing in the appellate record that indicates that the Professional Associations properly presented their complaints under these issues to the trial court. By failing to make a timely objection that specifically stated their complaints that, as a matter of law, the Professional Associations owed no duty and that there was no evidence of the applicable standard of care, the Professional Associations have waived any error. *See* TEX. R.APP. P. 33.1; *Steves Sash & Door Co., Inc.,* 751 S.W.2d at 477; *United Parcel Serv., Inc.,* 25 S.W.3d at 916. Therefore, we overrule the Professional Associations' third, fourth, fifth, and sixth issues. *See Steves Sash & Door Co., Inc.,* 751 S.W.2d at 477.

### 3. Was there any evidence that the Professional Associations were negligent?

In their seventh and eighth issues, the Professional Associations argue there was no evidence to support the jury's findings that they were negligent. In their direct-liability theory of negligence, the Alexander Family alleged the Professional Associations were negligent because they breached their duty to ensure that the Hospital's Anesthesia Department promulgated, adopted, and enforced appropriate policies. More specifically, the Alexander Family alleged, among other things, that the Professional Associations were negligent because they failed to promulgate, adopt and/or enforce appropriate policies regarding: (1) the selection, employment, and training of Nurse Anesthetists; (2) the performance reviews and assurance that the Nurse Anesthetists rendered quality

care; (3) the supervision of Nurse Anesthetists by anesthesiologists; (4) advising patients that their anesthesia would be administered by a Nurse Anesthetist rather than an anesthesiologist; and (5) ensuring that Nurse Anesthetists properly monitored patients and gave only appropriate medication.

In the trial court, the Alexander Family asserted that, under their contract with TOPS, the Professional Associations had assumed direct negligence duties to Mark Alexander, duties that are ordinarily owed only by the Hospital. *See Denton Reg'l Med. Ctr. v. LaCroix,* 947 S.W.2d 941, 942–50 (Tex.App.-Fort Worth 1997, writ denied) (discussing direct-liability theories against hospital regarding hospital's anesthesiology department). The Professional Associations did not preserve any error in the trial court challenging the existence of these negligence duties. Therefore, the only question before us under issues seven and eight is whether there was legally sufficient evidence to support the jury's findings that the Professional Associations breached these negligence duties. Without objection from the Professional Associations, the jury was instructed as follows:

"**Negligence**" when used with respect to the conduct of Carl J. Battaglia, M.D., P.A. and Tommy A. Polk, M.D., P.A., means failure to use ordinary care, that is, failing to do that which a professional association of ordinary prudence would have done under the same or similar circumstances or doing that which a professional association of ordinary prudence would not have done under the same or similar circumstances.[2]

Considering only the evidence and reasonable inferences therefrom that support

the jury's findings that the Professional Associations were negligent, and disregarding all evidence and inferences to the contrary, we hold that there was legally sufficient evidence to support these jury findings. *See Texarkana Memorial Hosp., Inc.,* 946 S.W.2d at 838; *Denton Reg'l Med. Ctr.,* 947 S.W.2d at 951. In their contract with TOPS, the Professional Associations agreed to: (1) "operate and staff" the Hospital's Anesthesia Department; (2) "provide all medical, technical, education, research, quality control and other customary services necessary or appropriate for the operation of a full service anesthesia program in the [Hospital]"; and (3) provide anesthesia services that comply with all applicable governmental, legal, and professional standards.

On appeal, the Professional Associations have not challenged the jury's findings that Nurse Cernosek and Dr. Crowder were negligent. As to evidence of the Professional Associations' direct liability, Dr. Kirby, an expert anesthesiologist, testified:

- Dr. Battaglia, acting in his capacity as head of the Hospital's Anesthesia Department, failed to carry out his administrative responsibilities as the head of the Anesthesia Department;

- The defendants or their agents violated written and accepted standards or guidelines of professional conduct;

- The defendants violated written or accepted standards of ethical conduct for anesthesiologists;

- Dr. Battaglia's actions in retaining Nurse Cernosek on the anesthesia staff were careless;

- Because Nurse Cernosek's performance and skills had never been eval-

---

**2.** This negligence definition is substantially similar to a negligence definition used in the jury charge in a direct-liability case against a

hospital regarding its anesthesiology department. *See Denton Reg'l Med. Ctr.,* 947 S.W.2d at 946 & n. 4.

uated during the seventeen years that she worked at the Hospital, there was no way for the people with whom she worked and her supervisors to have any idea about her competency, her capabilities, her knowledge base, and her qualifications to render anesthesia;

• The failure of Dr. Battaglia and Dr. Polk, as members of the Hospital's Anesthesia Department, to determine that Nurse Cernosek was not competent to administer anesthesia was so careless and irresponsible as to be a conscious disregard for the safety and well-being of patients such as Mark Alexander;

• Nurse Cernosek was not competent or qualified to perform the anesthesia that was scheduled to be administered to Mark Alexander during the surgery in question;

• Nurse Cernosek did not know how to properly use the anesthesia equipment that was in the operating room during Mark Alexander's surgery;

• The anesthesia care administered to Mark Alexander on September 19, 1997, violated the written standards and guidelines of the American Society of Anesthesiologists as well as anesthesia standards set out in commonly accepted scientific and medical literature;

• Dr. Crowder violated the Hospital bylaws by indicating to Mark Alexander that she would administer the anesthesia, when, in fact, she knew that Nurse Cernosek would administer the anesthesia; and

• Nurse Cernosek used the anesthesia equipment even though the alarms on the vital-sign monitors had apparently been turned off, in violation of good practice and recommendations by the Food and Drug Administration.

Dr. Roy Sheinbaum, another expert anesthesiologist, testified that a person responsible for anesthesia should not leave a patient in the care of a Nurse Anesthetist who is incapable of taking care of the patient, and that if one does not know the abilities of a Nurse Anesthetist, then one should not leave a patient alone in the care of that Nurse Anesthetist. Dr. Sheinbaum also testified that Nurse Cernosek did not know how to properly use the anesthesia equipment that was in the operating room during Mark Alexander's surgery. The Professional Associations argue there was no evidence of their negligence because the experts did not specifically use the words "Carl J. Battaglia, M.D., P.A." and "Tommy A. Polk, M.D., P.A." Under the facts of this case, we reject this contention.

First, some of the expert testimony spoke only in terms of the "defendants," which would include the Professional Associations. Second, there was evidence that the Professional Associations agreed to provide all of the anesthesia services to be rendered at the Hospital, that Dr. Battaglia was the sole principal of Carl J. Battaglia, M.D., P.A., and that Dr. Polk was the sole principal of Tommy A. Polk, M.D., P.A. In light of this evidence, it is reasonable to infer that the experts were referring to these doctors as acting on behalf of the Professional Associations when the experts testified that Drs. Battaglia and Polk failed to promulgate, adopt, and enforce appropriate policies regarding the Hospital's Anesthesia Department. Applying the appropriate standard of review, we hold there was legally sufficient evidence to prove the Professional Associations' negligence under a direct-liability theory. *See Texarkana Memorial Hosp., Inc.,* 946 S.W.2d at 838; *Denton Reg'l Med. Ctr.,* 947 S.W.2d at 951. Therefore, we overrule the Professional Associations' seventh and eighth issues.

### 4. Did the trial court err by holding the Professional Associations liable under the direct-liability theory even though Drs. Battaglia and Polk were not found negligent in their individual capacities?

■ In their ninth and tenth issues, the Professional Associations assert the trial court's directed verdict in favor of Dr. Polk in his individual capacity and the jury's failure to find that Dr. Battaglia was negligent in his individual capacity included a determination that each doctor, acting as principal of his respective Professional Association, was not negligent under the Alexander Family's direct-liability theory. The record does not support this assertion. The record from the motion-for-directed-verdict hearing indicates the trial court understood that the directed verdict was based only on the claim of medical negligence against Dr. Polk in his individual capacity, and not as to his acts or omissions as principal of Tommy A. Polk, M.D., P.A. under a direct-liability theory.

Similarly, our record shows the trial court charged the jury separately as to the medical negligence alleged against Dr. Battaglia in his individual capacity and as to the direct-liability theory against both Professional Associations. The Professional Associations did not object to the negligence definitions as to these different defendants, so that issue is not before us. Nonetheless, the trial court charged the jury as to the medical negligence of Dr. Battaglia individually, and the jury's failure to find him negligent is not inconsistent with the jury's findings that the Professional Associations were negligent under the direct-liability

theory. *See Denton Reg'l Med. Ctr.*, 947 S.W.2d at 949–51 (holding that medical-negligence claims against health-care providers are independent of direct-liability claims against hospital and that hospital can be held liable even if individual doctor is found not to be medically negligent). The Professional Associations can be held liable under a direct-liability theory even if Drs. Polk and Battaglia were not negligent in their individual capacities. Accordingly, we overrule the Professional Associations' ninth and tenth issues.[3]

### 5. Did the trial court err in holding the Professional Associations liable for each other's liability based on the jury's joint-venture finding?

■ In their fourteenth issue, the Professional Associations assert the jury's finding in question number seven, that the Professional Associations were engaged in a joint venture on September 19, 1997, is immaterial and insufficient to create vicarious liability of one Professional Association for the other's negligence. The Professional Associations assert that question number seven failed to include a finding that the negligence liability of the other Professional Association is an obligation of the joint venture, an element of recovery. The Professional Associations argue that joint venturers are liable for the debts of the joint venture, not for the liabilities of other joint venturers in their individual capacities.

We will presume that the Professional Associations are correct and that the Alexander Family needed to obtain findings as

---

3. Because we have affirmed the direct-liability theories of recovery against the Professional Associations and because of our disposition of the fourteenth and fifteenth issues, we need not address the eleventh, twelfth, and thirteenth issues; those issues do not present

reversible error, given that we would affirm the Professional Associations' joint and several liability even if the Professional Associations should not have been held vicariously liable for the negligence of Dr. Crowder and Nurse Cernosek. *See* Tex.R.App.P. 44.1.

to the following elements for their joint-venture theory of vicarious liability: (1) the Professional Associations were negligent; (2) the Professional Associations were engaged in a joint venture; and (3) this negligence liability was an obligation of the joint venture. The Alexander Family obtained jury findings as to the first two of these three elements. No parties objected to the form of question number seven or requested that the question be changed to add this other element. After reviewing the record, we find there was factually sufficient evidence to support a finding that the Professional Associations' negligence liability was an obligation of their joint venture.[4] Therefore, a finding as to the omitted element shall be deemed found by the trial court. *See* TEX.R. CIV. P. 279; *Ramos v. Frito–Lay, Inc.*, 784 S.W.2d 667, 668–69 (Tex.1990); *Jamar v. Patterson*, 910 S.W.2d 118, 120–23 (Tex. App.-Houston [14th Dist.] 1995, writ denied). By virtue of this deemed finding, the Professional Associations' argument fails, and each Professional Association is responsible for the other Professional Association's liability. *See Truly v. Austin*, 744 S.W.2d 934, 937 (Tex.1988) (holding that a joint venturer is jointly and severally liable for joint-venture obligations); *North Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 121–22 (Tex.App.-Beaumont 2001, pet. filed) (stating that common-law joint-and-several-liability rules for partner-

ship, agency, joint venture, and piercing the corporate veil situations survived the enactment of § 33.013 of the Texas Civil Practice and Remedies Code). Accordingly, we overrule the Professional Associations' fourteenth issue.

### 6. Did the trial court err in imposing joint and several liability on the Professional Associations?

In their fifteenth issue, the Professional Associations assert the trial court erred in holding them jointly and severally liable because, under § 33.013(b) of the Texas Civil Practice and Remedies Code, each Professional Association's percentage of responsibility was less than 50%, precluding joint and several liability. *See* TEX. CIV. PRAC. & REM CODE ANN. § 33.013(b). Even if the Professional Associations' construction of § 33.013(b) were correct, there would be no reversible error. Common-law joint-and-several-liability rules for partnership, agency, joint venture, and piercing the corporate veil situations survived the enactment of § 33.013 of the Texas Civil Practice and Remedies Code. *See Emmons*, 50 S.W.3d at 121–22. Even though this only makes the joint venturers jointly and severally liable for the joint-venture obligations, the sole judgment debtors remaining in this action are the Professional Associations, the two

---

**4.** The Professional Associations also assert that question number seven was immaterial because the trial court granted a directed verdict in favor of Red Oak Anesthesia Associates, a joint venture between the Professional Associations, and because the jury's answer to question number seven was based on the Red Oak Joint Venture Agreement. However, the Professional Associations waived any objection they had to the form of question number seven by their failure to object to this question. Furthermore, nothing in that question limits its scope to the Red Oak Anesthesia Associates joint venture. Because question number seven was not limited in this way, the trial court's directed verdict in favor of Red Oak Anesthesia Associates does not make the jury's answer to this question immaterial because that answer could have been based on the jury's finding that a joint venture existed between the Professional Associations beyond the Red Oak Anesthesia Associates joint venture. We need not discuss the evidence supporting the jury's answer to question number seven because, on appeal, the Professional Associations do not challenge the sufficiency of the evidence supporting the jury's affirmative answer to this question.

joint venturers. Dr. Crowder has paid the entire judgment against her, and, based on our disposition of the other issues in this case, we affirm the trial court's judgment of several liability against each of the Professional Associations. Therefore, the only remaining liability for which the Professional Associations can be jointly and severally liable is the other Professional Association's liability. *See Truly*, 744 S.W.2d at 937; *Emmons*, 50 S.W.3d at 121. Given our disposition of the fourteenth issue, the Professional Associations are jointly and severally liable for the remaining judgment. The Professional Associations' fifteenth issue asserts that joint and several liability would be inconsistent with § 33.013(b) of the Texas Civil Practice and Remedies Code. Because we conclude to the contrary, we also overrule the fifteenth issue.

## 7. *Did the trial court correctly calculate prejudgment interest under the Medical Liability and Insurance Improvement Act?*

In the sixteenth issue, the Professional Associations challenge the trial court's interpretation of the prejudgment interest section of the Medical Liability and Insurance Improvement Act. This section, which took effect on September 1, 1995, reads in its entirety:

### SUBCHAPTER P

### PREJUDGMENT INTEREST

Application of Other Law

Sec. 16.01. Notwithstanding Articles 1E.101, 1E.102, and 1E.104–1E.108, Title 79, Revised Statutes, prejudgment interest in a health care liability claim shall be awarded in accordance with this subchapter.

Computation of Prejudgment Interest

Sec. 16.02. (a) In a health care liability claim, prejudgment interest may not be charged with respect to a defendant physician or health care provider who has settled the claim before the 181st day after the date notice of the claim was first mailed to the physician or health care provider.

(b) In a health care liability claim that is not settled within the period specified by Subsection (a) of this section, *the judgment must include prejudgment interest on past damages found by the trier of fact*, but shall not include prejudgment interest on future damages found by the trier of fact.

(c) Prejudgment interest allowed under this subchapter shall be computed in accordance with Article 1E.103, Title 79, Revised Statutes, for a period beginning on the date of injury and ending on the date before the date the judgment is signed.

(d) In this section:

(1) "Past damages" means damages awarded to compensate the claimant for loss the claimant will incur for a period beginning on the date of injury and ending on the date before the date of judgment.

(2) "Future damages" means damages awarded to compensate the claimant for loss the claimant will incur after the date of judgment.

TEX.REV.CIV. STAT. ANN. art. 4590i §§ 16.01 & 16.02 (emphasis added).

The trial court did not award prejudgment interest on future damages. The trial court calculated the prejudgment interest based on the "past damages found by the trier of fact," without deducting the dollar-for-dollar settlement credit for the pretrial settlement with certain defendants. The Professional Associations complain the trial court should have deducted

the settlement credit first, so that prejudgment interest would not be awarded on the amount of the settlement and on sums not awarded in the trial court's judgment.

■ In the only case addressing this issue, the Corpus Christi Court of Appeals held that the plain meaning of this statute requires that prejudgment interest be assessed on the past damages found by the jury, without deduction for settlement credits. *Samples v. Graham*, 76 S.W.3d 615, 619–22 (Tex.App.-Corpus Christi 2002, no pet. h.). For the reasons stated below, we agree with this statutory interpretation.

■ We review the trial court's interpretation of applicable statutes *de novo*. *Johnson v. City of Fort Worth*, 774 S.W.2d 653, 655–56 (Tex.1989). In construing a statute, our objective is to determine and give effect to the Legislature's intent. *See National Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex.2000). We presume that the Legislature intended the plain meaning of its words. *Id.* If possible, we must ascertain the Legislature's intent from the language it used in the statute and not look to extraneous matters for an intent the statute does not state. *Id.*

■ Even when a statute is not ambiguous on its face, we may consider other factors to determine the Legislature's intent, including: (1) the object sought to be obtained; (2) the circumstances of the statute's enactment; (3) the legislative history; (4) the common law or former statutory provisions, including laws on the same or similar subjects; (5) the consequences of a particular construction; (6) administrative construction of the statute; and (7) the title, preamble, and emergency provision. *See* Tex. Gov't Code § 311.023; *Helena Chemical Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex.2001). Additionally, we consider the statute as a whole

rather than its isolated provisions. *Helena Chemical Co.*, 47 S.W.3d at 493. We do not give one provision a meaning out of harmony or inconsistent with other provisions, even though it might be susceptible to such a construction standing alone. *Id.* We must presume the Legislature intends an entire statute to be effective and that a just and reasonable result is intended. *See* Tex. Gov't Code § 311.021(2), (3).

At the outset, we note that the cases upon which the Professional Associations rely are based on a different prejudgment interest statute and are not on point because the language of § 16.02 is different. *Compare Roberts v. Grande*, 868 S.W.2d 956, 959–60 (Tex.App.-Houston [14th Dist.] 1994, no writ) (based on former Texas Revised Civil Statute, article 5069–1.05, § 6(a), *repealed by* Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 6(a), 1997 Tex. Gen. Laws 3091, 3602, *now codified at* Tex. Fin.Code Ann. § 304.102); *Sisters of Charity v. Dunsmoor*, 832 S.W.2d 112, 117 (Tex.App.-Austin 1992, writ denied) (same) *with Samples*, 76 S.W.3d at 619–22 (based on § 16.02). In construing the meaning of § 16.02, we must focus on the language the Legislature used in this statute and give effect to its words. *See* Tex.Rev.Civ. Stat. Ann. art. 4590i § 16.02; *National Liab. & Fire Ins. Co.*, 15 S.W.3d at 527.

When the Texas Supreme Court held that prejudgment interest should be awarded in tort actions under common law, it held that prejudgment interest should not be awarded on future damages. *See Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552–55 (Tex.1985), *superseded by statute as stated in C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315, 324–28 (Tex.1994) *and overruled in part on other grounds by Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528–33 (Tex.1998). However, in 1987, the Legislature enacted a statute providing for prejudgment inter-

est in personal injury cases, and this statute stated that, with a few exceptions that are not relevant here, prejudgment interest should accrue "on the amount of the judgment . . ." *See* Act of June 3, 1987, 70th Leg., 1st C. S., ch. 3, § 1, 1987 Tex. Gen. Laws 51, 51, repealed by Act of May 24, 1997, 75th Leg. R.S., ch. 1008, § 6(a), 1997 Tex. Gen. Laws 3091, 3602 (now codified at Tex. Fin.Code Ann. § 304.102). In 1994, the Texas Supreme Court held that, under this statute, prejudgment interest should be awarded on both past and future damages. *See C & H Nationwide, Inc.,* 903 S.W.2d at 324–28. Apparently in response to this holding, the Legislature enacted the statute that is before us today. *See Samples,* 76 S.W.3d at 618–19 & n. 3.

The departure from the language of the prejudgment interest statute that formerly applied to health care liability claims indicates a legislative intent to change the basis on which courts calculate prejudgment interest. *Compare* Act of June 3, 1987, 70th Leg., 1st C. S., ch. 3, § 1, 1987 Tex. Gen. Laws 51, 51, repealed by Act of May 24, 1997, 75th Leg. R. S., ch. 1008, § 6(a), 1997 Tex. Gen. Laws 3091, 3602 (now codified at Tex. Fin.Code Ann. § 304.102) *with* Tex.Rev.Civ. Stat. Ann. art. 4590i § 16.02. If the Legislature wanted to abolish prejudgment interest on future damages for health care liability claims without changing the basis on which courts calculate prejudgment interest, then, in drafting § 16.02, all the Legislature had to do was replace "the amount of the judgment" with language such as "the amount of past damages awarded in the judg-

ment." *See C & H Nationwide, Inc.,* 903 S.W.2d at 324–28; *Samples,* 76 S.W.3d at 618–21. The Legislature's use of new language—"past damages found by the trier of fact"—indicates an intent to choose a different basis for calculating prejudgment interest. *See Samples,* 76 S.W.3d at 618–21.[5]

The Professional Associations' main argument is that the trial court's interpretation of this statute leads to an absurd result because it awards prejudgment interest on amounts that are not awarded in the judgment. Though the Legislature's logic in crafting this statute may not be apparent, the unambiguous language of the words it chose supports the trial court's interpretation. *See Samples,* 76 S.W.3d at 618–21. Section 16.02(a) states that, in a health care liability claim, prejudgment interest may not be charged with respect to a defendant physician or health care provider who has settled the claim before the 181st day after the date notice of the claim was first mailed to the physician or health care provider. *See* § 16.02(a). This section, along with § 16.02(b), indicates that prejudgment interest should be charged as to settlements that occur more than 180 days after the notice of claim, as did the settlements in this case. Section 16.02(b) states that, "[i]n a health care liability claim that is not settled within the period specified by Subsection (a) of this section, the judgment *must include prejudgment interest on past damages found by the trier of fact,* but shall not include prejudgment interest on future damages found by the trier of fact." § 16.02(b) (emphasis added). We hold

---

5. The legislative history of § 16.02 does not appear to help the Professional Associations either. The original bill used "judgment" language and would have kept the same basis for calculating prejudgment interest while still precluding courts from awarding prejudgment interest on future damages in health care liability judgments. *See* Tex. H.B. 971, 74th Leg., R.S. (1995); *Samples,* 76 S.W.3d at 619–20. This bill died in committee, and the

Legislature instead enacted the language of §§ 16.01 & 16.02 that is before us today. *See Samples,* 76 S.W.3d at 619–20. Otherwise, the legislative history is not helpful on the issue before this court. The legislative history suggests an intent to prevent prejudgment interest from being awarded on future damages— an issue not implicated by the questions raised in this case.

that, under the unambiguous language of § 16.02, prejudgment interest should be calculated on the amount of past damages found by the trier of fact—not the amount found by the trier of fact minus all settlement credits. *See* § 16.02; *Samples,* 76 S.W.3d at 618–21.

In an effort to avoid this statutory interpretation, the Professional Associations point out that the Legislature used the phrase "past damages found by the trier of fact" rather than "all past damages found by the trier of fact." *See* § 16.02(b). The Professional Associations also assert that the use of the word "awarded" in the definition of "past damages" shows that the Legislature intended settlement credits to be deducted from the amount of past damages before calculating the amount of prejudgment interest. *See* § 16.02(d)(1). We disagree with both contentions. The Legislature's failure to use the word "all" does not change the plain meaning of the words that it did use nor does it alter the fact that there is no statutory language indicating an intent to reduce the amount of past damages found by the trier of fact upon which prejudgment interest is to be calculated. Further, though courts and lawyers often speak of judgments "awarding" damages, they also speak of juries "awarding" damages. *See, e.g., Interstate Northborough P'ship v. State of Texas,* 66 S.W.3d 213, 218 (Tex.2001) (stating "[t]he jury awarded $1,000,000 in damages . . ."). The use of "awarded" in the definition of "past damages" does not indicate that settlement credits should first be deducted. Under § 16.02, the trier of fact determines the "past damages" on which the prejudgment interest is based. *See* § 16.02. Therefore, it logically follows that the Legislature was referring to the trier of fact as the entity that "awards" the past damages. Based on the context and reading the statute as a whole, we find no intent to deduct settlement credits in the Legislature's use of the word "awarded." *See* §§ 16.01 & 16.02.

The Professional Associations' interpretation of this statute would render meaningless all of § 16.02(a) as well as the portion of § 16.02(b) italicized above. Such a construction is untenable. Our function is not to question the wisdom of § 16.02; rather, we must apply it as written. *See National Liab. & Fire Ins. Co.,* 15 S.W.3d at 527; *Lee v. City of Houston,* 807 S.W.2d 290, 293 (Tex.1991). The trial court's interpretation of § 16.02 is consistent not only with the plain wording of the statute but also with the Texas Supreme Court's interpretation of the phrase "damages found by the trier of fact" in § 33.013(a) of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM CODE ANN. § 33.013(a) (stating that, subject to certain exceptions not relevant here, a liable defendant is liable to a claimant "only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death, or other harm for which damages are allowed"); *C & H Nationwide, Inc.,* 903 S.W.2d at 321–23 (holding that, in calculating liability under § 33.013(a), the trial court does not deduct any settlement credits from "the damages found by the trier of fact" before multiplying this amount by the defendant's percentage of responsibility). Therefore, we hold the trial court properly calculated prejudgment interest based on the past damages found by the jury, without any deduction for settlement credits. We overrule the Professional Associations' sixteenth issue.

### CONCLUSION

The Alexander Family pleaded direct-liability theories against the Professional Associations, and the Professional Associations did not preserve error as to their duplicative-submission argument. There was legally sufficient evidence that the

Professional Associations were negligent under direct-liability theories. Therefore, we overrule the Professional Associations' first, second, seventh, and eighth issues. We find waiver based on the Professional Associations' failure to preserve error as to the third, fourth, fifth, and sixth issues, and we overrule those issues. We overrule the ninth and tenth issues because the Professional Associations may be held liable for direct liability even if Drs. Battaglia and Polk are not held liable in their individual capacities. Based on these rulings, we do not address the eleventh, twelfth, and thirteenth issues. The trial court did not err in holding the Professional Associations jointly and severally liable for each other's liability based on the jury's joint-venture finding. Therefore, we also overrule the fourteenth and fifteenth issues. Finally, we overrule the sixteenth issue because the trial court properly calculated the prejudgment interest under § 16.02 of the Medical Liability and Insurance Improvement Act based on the past damages found by the jury, without a deduction for any settlement credits.

We affirm the trial court's judgment.