ACCEPTED
02-15-00111-cv
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
12/14/2015 4:31:00 PM
DEBRA SPISAK
CLERK

## CASE NO. 02-15-00111-CV

FILED
COURT OF APPEALS
SECOND DISTRICT OF TEXAS

December 15, 2015

DEBRA SPISAK, CLERK

IN THE COURT OF APPEALS
FOR THE SECOND JUDICIAL DISTRICT
FORT WORTH, TEXAS

AZLE MANOR, INC.,

Appellant,

V.

PATTY PATTERSON and PAMELA BEAVERS,
Individually and as Representatives of the
ESTATE OF MARY ANN DAVIS, Deceased,

Appellees.

_____

Appeal from 48th Judicial District Court of Tarrant County, Texas
Cause No. 048-260807-12

_____

## APPELLEES' MOTION TO SUPPLEMENT CASE LAW IN SUPPORT OF APPELLEES' BRIEF

TO THE HONORABLE COURT:

Appellees Patty Patterson and Pamela Beavers, Individually and as Representatives of the Estate of Mary Ann Davis, Deceased (collectively "Appellees") file this Motion to Supplement Case Law in Support of Appellees' Brief pursuant to Texas Rules of Appellate Procedure 38.7, respectfully showing the Court as follows:

**APPELLEES' MOTION TO SUPPLEMENT CASE LAW IN SUPPORT OF APPELLEES' BRIEF - Page 1**

1.     Appellant filed its brief in this matter on August 27, 2015.  Appellees then filed their brief in this matter on October 28, 2015.  Finally, Appellant filed its reply brief on November 17, 2015.

2.     After Appellees filed their brief and Appellant filed its reply brief, Appellees became aware of additional relevant case law in *Cresthaven Nursing Residence v. Freeman*, 134 S.W.3d 214 (Tex. App.—Amarillo 2003, no pet.).

3.     Because *Cresthaven* arises from similar facts and involves the expert testimony of a family practitioner on the cause of death of a nursing home resident, like this appeal, this case is highly relevant and justice requires that Appellees' brief be supplemented with this case law.

4.     Accordingly, pursuant to Texas Rule of Appellate Procedure 38.7, Appellees respectfully request the Court grant this motion and supplement Appellees' brief with *Cresthaven Nursing Residence v. Freeman* in support of Appellees' arguments.

5.     A copy of *Cresthaven Nursing Residence v. Freeman* is attached hereto as Exhibit "A."

WHEREFORE, premises considered, Appellees Patty Patterson and Pamela Beavers, Individually and as Representatives of the Estate of Mary Ann Davis pray that the Court grant Appellees' Motion to Supplement Case Law in Support of Appellees' Brief as requested herein, and for such other and further relief, at law or

in equity, to which Appellees may be justly entitled.

Respectfully submitted,

CURNUTT & HAFER, L.L.P.

By: /s/Kelly J. Curnutt
     Kelly J. Curnutt
     State Bar No. 00787316
     KCurnutt@CurnuttHafer.com
     Adam K. Alexander
     State Bar No. 24082613
     AAlexander@CurnuttHafer.com

101 East Park Row
Arlington, TX 76010
(817) 548-1000 - Telephone
(817) 548-1070 - Facsimile

*COUNSEL FOR APPELLEES*
*PATTY PATTERSON and PAMELA*
*BEAVERS, Individually and as*
*Representatives of the ESTATE OF*
*MARY ANN DAVIS, Deceased*

## CERTIFICATE OF CONFERENCE

I hereby certify that I attempted to confer with Gail Friend and Staci Bouthillette, counsel for Appellant, on December 14th, 2015 regarding the relief sought in the Motion. Ms. Friend's assistant informed me that Ms. Friend and Ms. Bouthillette were unavailable, and I left a message. Due to the upcoming oral argument in this matter, I could not wait to confer with opposing counsel before filing this Motion, and thus the Motion is presented to the Court for determination.

/s/ *Adam K. Alexander*
Adam K. Alexander


## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument was delivered electronically to the following counsel of record this 14th day of December, 2015:

Gail N. Friend
Staci Bouthillette
Friend & Associates
1010 Lamar, Suite 1010
Houston, Texas 77002
*Counsel for Appellant*

/s/ Kelly J. Curnutt
Kelly J. Curnutt

# EXHIBIT A

# *Cresthaven Nursing Residence v. Freeman*

Court of Appeals of Texas, Seventh District, Amarillo

February 5, 2003, Decided

NO. 07-02-0011-CV

**Reporter**

134 S.W.3d 214; 2003 Tex. App. LEXIS 1187

CRESTHAVEN NURSING RESIDENCE; CANTEX HEALTHCARE CENTERS D/B/A CRESTHAVEN NURSING RESIDENCE; BRATEX, INC.; GAMTEX, INC.; MEDCO MEDICAL SERVICES; ONTEX, INC.; AMLON U.S.A., INC., APPELLANTS v. DEBORAH FREEMAN, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF WANDA GRANGER, ET AL., APPELLEES

**Subsequent History:** On rehearing at *Cresthaven Nursing Residence v. Freeman, 2003 Tex. App. LEXIS 4291 (Tex. App. Amarillo, May 19, 2003)*

**Prior History:** [**1] FROM THE 60TH DISTRICT COURT OF JEFFERSON COUNTY; NO. B155491; HONORABLE GARY SANDERSON, JUDGE.

**Disposition:** Issues sustained in part and overruled in part.

## Core Terms

pre judgment interest, damages, appellees, cap, general partner, nursing home, records, pain, pet, infection, Nursing, spoliation, trial court, healthcare provider, awarding damages, past damages, no evidence, appellants', survival, days, mental anguish, catheter, parties, trier of fact, entries, patient, issues, standard of care, amount awarded, broken leg

## Case Summary

### Procedural Posture

A jury for the 60th District Court of Jefferson County (Texas) found that appellant nursing home negligently caused injury and death to the decedent and awarded $ 4.5 million in survival damages and $ 4.5 million in wrongful death damages. The court signed a judgment awarding all appellee daughters damages jointly and severally from appellant healthcare providers. All of the parties appealed.

### Overview

The daughters sued the healthcare providers for damages resulting from the care and treatment the decedent received while a resident of the nursing home, which allegedly resulted in her death. The appellate court held that (1) because the daughters did not submit a charge segregating past damages from future damages, no prejudgment interest was available on the wrongful death damages awarded; (2) the trial court did not abuse its discretion in refusing to offset prejudgment interest; (3) the judgment should be calculated based on a single statutory cap adjusted by the consumer price index and that prejudgment interest should be calculated on the award of survival damages only; (4) the facts rose to a scintilla of evidence which would support the giving of the spoliation jury instruction within the discretion afforded to the trial judge; and (5) the trial court did not abuse its discretion in allowing the daughters' expert to testify. Additionally, the awards of survival damages and wrongful death damages were excessive and the trial court would have to reduce the damages as suggested in the appellate court's remittitur or conduct a new trial.

### Outcome

The appellate court sustained the healthcare providers' point on the issue of the damages cap. It reversed the trial court's finding that prejudgment interest was subject to the damages cap. Additionally, the appellate court suggested reduced awards for damages, which if not accepted would result in reversal and a remand for a new trial. The appellate court overruled the remaining issues.

## LexisNexis® Headnotes

Healthcare Law > ... > Actions Against Facilities > Facility Liability > General Overview

**HN1** Under Medical Liability and Insurance Improvement Act, *Tex. Rev. Civ. Stat. Ann. art. 4590i*, there is a cap on damages recoverable from a health care provider.

> Healthcare Law > ... > Actions Against Facilities > Facility Liability > General Overview

> Healthcare Law > Healthcare Litigation > Actions Against Healthcare Workers > General Overview

> Healthcare Law > Healthcare Litigation > Actions Against Healthcare Workers > Doctors & Physicians

**HN2** See *Tex. Rev. Civ. Stat. Ann. art. 4590i, § 11.02(a)* (Vernon Supp. 1999).

> Healthcare Law > ... > Actions Against Facilities > Facility Liability > General Overview

> Torts > Wrongful Death & Survival Actions > General Overview

> Torts > Wrongful Death & Survival Actions > Survival Actions

**HN3** The cap on damages recoverable from a health care provider is further subject to a consumer price index adjustment. *Tex. Rev. Civ. Stat. Ann. art. 4590i, § 11.04*. The cap applies to both wrongful death and survival actions.

> Healthcare Law > ... > Actions Against Facilities > Facility Liability > General Overview

> Torts > ... > Defenses > Comparative Fault > General Overview

> Torts > Procedural Matters > Multiple Defendants > Joint & Several Liability

> Torts > Vicarious Liability > Partners > General Overview

> Torts > Vicarious Liability > Partners > General Partners

**HN4** It has been held that the damages provision in *Tex. Rev. Civ. Stat. Ann. art. 4590i, § 11.02(a)* (Vernon Supp. 1999) of the Medical Liability and Insurance Improvement Act, *Tex. Rev. Civ. Stat. Ann. art. 4590i*, is to be applied on a per defendant basis. Thus, a plaintiff who recovers against more than one defendant may obtain a judgment in excess of the cap as long as the combined statutory liability of all defendants is not exceeded. Further, the cap applicable to a single defendant who is jointly and severally liable in a comparative negligence situation is not increased by the number of culpable defendants.

> Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview

> Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > Partnership Liabilities

> Torts > Procedural Matters > Multiple Defendants > Joint & Several Liability

> Torts > Vicarious Liability > Partners > General Overview

**HN5** Statutory law imposes joint and several liability on general partners for the debts and obligations of a partnership making them vicariously liable. *Tex. Rev. Civ. Stat. Ann. art. 6132b-3.04*. Vicarious liability is a judicially created vehicle for enforcing remedies for wrongs. It is the imposition of liability on one party for the actionable conduct of another based on a relationship between the parties.

> Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview

> Healthcare Law > ... > Actions Against Facilities > Facility Liability > General Overview

> Torts > ... > Types of Damages > Compensatory Damages > General Overview

> Torts > ... > Types of Damages > Compensatory Damages > Measurements

> Torts > Vicarious Liability > Partners > General Overview

> Torts > Vicarious Liability > Partners > General Partners

**HN6** One of the stated purposes of the Medical Liability and Insurance Improvement Act, *Tex. Rev. Civ. Stat. Ann. art. 4590i*, is to decrease the cost of claims and assure that awards are rationally related to actual damages. *Tex. Rev. Civ. Stat. Ann. art. 4590i, § 1.02(b)(2)* (Vernon Supp. 1999).

> Civil Procedure > Remedies > Judgment Interest > General Overview

> Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

> Healthcare Law > ... > Actions Against Facilities > Facility Liability > General Overview

> Torts > Remedies > Damages > General Overview

**HN7** Pursuant to *Tex. Rev. Civ. Stat. Ann. art. 4590i, § 16.02* of the Medical Liability and Insurance Improvement Act, *Tex. Rev. Civ. Stat. Ann. art. 4590i*, judgments must include prejudgment interest on past damages found by the trier of fact, but are not to include prejudgment interest on future damages. *Tex. Rev. Civ. Stat. Ann. art. 4590i, § 16.02(b)* (Vernon Supp. 1999).

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

Healthcare Law > ... > Actions Against Facilities > Facility Liability > General Overview

Healthcare Law > Healthcare Litigation > Actions Against Healthcare Workers > General Overview

Healthcare Law > Healthcare Litigation > Actions Against Healthcare Workers > Doctors & Physicians

Torts > Remedies > Damages > General Overview

**HN8** *Tex. Rev. Civ. Stat. Ann. art. 4590i, § 11.02* of the Medical Liability and Insurance Improvement Act, *Tex. Rev. Civ. Stat. Ann. art. 4590i*, states that where final judgment is rendered against a physician or health care provider, the limit of civil liability for damages of the physician or health care provider shall be limited to an amount not to exceed $ 500,000. Thus, the cap applies to damages, not the amount of the judgment. Further, the cap does not include the amount of damages awarded on claims for necessary medical, hospital, and custodial care. Tex. Rev. Civ. Stat. Ann. § 11.02(b) (Vernon Supp. 1999).

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

Healthcare Law > ... > Actions Against Facilities > Facility Liability > General Overview

Torts > Remedies > Damages > General Overview

**HN9** *Tex. Rev. Civ. Stat. Ann. art. 4590i, § 16.02* of the Medical Liability and Insurance Improvement Act, *Tex. Rev. Civ. Stat. Ann. art. 4590i*, provides that the judgment must include prejudgment interest on past damages, but shall not include prejudgment interest on future damages. *Tex. Rev. Civ. Stat. Ann. art. 4590i, § 16.02(b)*.

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

Healthcare Law > ... > Actions Against Facilities > Facility Liability > General Overview

**HN10** Prejudgment interest is not included in the statutory cap on damages provided for in *Tex. Rev. Civ.* *Stat. Ann. art. 4590i, § 11.02(a)* (Vernon Supp. 1999) of the Medical Liability and Insurance Improvement Act, *Tex. Rev. Civ. Stat. Ann. art. 4590i*.

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

Healthcare Law > ... > Actions Against Facilities > Facility Liability > General Overview

Torts > Remedies > Damages > General Overview

**HN11** *Tex. Rev. Civ. Stat. Ann. art. 4590i, § 16.02(d)(1)* of the Medical Liability and Insurance Improvement Act, *Tex. Rev. Civ. Stat. Ann. art. 4590i*, provides that prejudgment interest shall be paid on past damages found by the trier of fact, but not on future damages. Past damages are defined as those awarded to compensate the claimant for their loss incurred from the period beginning on the date of injury and ending on the day before the date of judgment.

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

Healthcare Law > ... > Actions Against Facilities > Facility Liability > General Overview

Torts > Remedies > Damages > General Overview

Torts > ... > Remedies > Damages > Measurement of Damages

**HN12** The legislature did not provide that prejudgment interest is to be awarded on the amount of past damages included in the judgment, but on the amount awarded by the trier of fact. Prejudgment interest is applicable on the full amount of past damages found by the jury prior to the application of the liability cap, which determines the amount for which the defendant is liable in the judgment. Therefore, *Tex. Rev. Civ. Stat. Ann. art. 4590i, § 16.02(d)(1)* of the Medical Liability and Insurance Improvement Act, *Tex. Rev. Civ. Stat. Ann. art. 4590i*, requires calculation of prejudgment interest on the amount of damages found by the jury.

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

Healthcare Law > ... > Actions Against Facilities > Facility Liability > General Overview

Torts > Remedies > Damages > General Overview

**HN13** *Tex. Rev. Civ. Stat. Ann. art. 4590i, § 16.02(d)(1)* of the Medical Liability and Insurance Improvement Act, *Tex. Rev. Civ. Stat. Ann. art. 4590i*, clearly provides that prejudgment interest is not to be awarded on future damages.

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

Torts > Remedies > Damages > General Overview

**HN14** The burden of segregating past and future damages is on the party seeking to obtain prejudgment interest. It is fair to place the burden of submitting a proper jury charge on the party to whom the benefit of the charge will result.

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

Healthcare Law > ... > Actions Against Facilities > Facility Liability > General Overview

**HN15** Prejudgment interest is to be computed in accordance with the Texas Finance Code. *Tex. Rev. Civ. Stat. Ann. art. 4590i, § 16.02(c)* (Vernon Supp. 1999).

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

**HN16** Under *Tex. Fin. Code Ann. § 304.108(a)*, a court may consider the periods of delay in the trial and order that prejudgment interest does not accrue during them. However, prejudgment interest is to be denied only for delays caused by the parties and not a crowded trial docket.

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

**HN17** An appellate court reviews a trial court's refusal to offset prejudgment interest under an abuse of discretion standard.

Civil Procedure > Pretrial Matters > Continuances

Civil Procedure > Remedies > Judgment Interest > General Overview

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Continuances

**HN18** It has been held not to be an abuse of discretion to refuse to make an offset against prejudgment interest when one motion for continuance was granted at one party's request, another motion for continuance was granted at the other party's request, and one was granted pursuant to a joint motion.

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Evidence > Relevance > Preservation of Relevant Evidence > Spoliation

**HN19** The doctrine of spoliation refers to the improper intentional destruction of evidence relevant to a case. Trial courts have broad discretion to take measures to correct the ill effects resulting from spoliation, including a jury instruction on the spoliation presumption and death penalty sanctions.

Evidence > Relevance > Preservation of Relevant Evidence > Spoliation

**HN20** A party may have a statutory, regulatory or ethical duty to preserve evidence.

Evidence > Relevance > Relevant Evidence

Evidence > Relevance > Preservation of Relevant Evidence > Spoliation

**HN21** A party has a duty to preserve relevant evidence once litigation arises, and a duty to exercise reasonable care to preserve relevant evidence if it actually or reasonably should anticipate litigation.

Evidence > Relevance > Preservation of Relevant Evidence > Spoliation

**HN22** The deliberate spoliation of evidence relevant to a case raises the presumption that the evidence would have been unfavorable to the cause of the spoliator. The presumption may be rebutted with a showing that the evidence was not destroyed with a fraudulent intent or purpose. The presumption does not apply when documents are merely lost.

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

**HN23** A trial court must submit in the charge to the jury all questions, instructions, and definitions raised by the pleadings and the evidence. If the instruction might aid the jury in answering the issues presented or if there is any support in the evidence for the instruction, it is proper.

Torts > Remedies > Damages > General Overview

**HN24** In determining whether damages are excessive, an appellate court should use the same test as that for a factual sufficiency question. Thus, the appellate court must consider and weigh all of the evidence and should set aside the award only if the challenged finding of fact is so contrary to the overwhelming weight of the evidence as to be manifestly unjust. The mere fact that an award is large does not show that the jury was influenced by passion, prejudice, sympathy, or other circumstances not in evidence, and the award must be flagrantly outrageous, extravagant, and so excessive that it shocks the judicial conscience.

Torts > Remedies > Damages > General Overview

**HN25** Mental anguish must be a high degree of mental pain and distress and must necessarily involve more than mere worry, anxiety, vexation, embarrassment, or anger. While juries must be afforded discretion in arriving at the determination of a figure for which there is no exact evaluation, there must be some evidence to justify the amount awarded, and juries cannot simply pick a number.

Torts > Remedies > Damages > General Overview

Torts > Wrongful Death & Survival Actions > General Overview

Torts > ... > Types of Damages > Compensatory Damages > Pain & Suffering

**HN26** No physical manifestation of mental anguish is necessary in wrongful death cases, and the issue can be submitted to the jury on the basis of the impact suggested by the circumstances surrounding the loss.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Healthcare Law > ... > Actions Against Facilities > Standards of Care > General Overview

Torts > Malpractice & Professional Liability > Healthcare Providers

**HN27** In a medical malpractice case, a plaintiff must establish a duty requiring defendants to conform to a certain standard of conduct, the applicable standard of care and its breach, a resulting injury, and a reasonably close causal connection between the breach of the standard of care and the injury. Expert testimony is necessary to meet that burden.

Evidence > ... > Testimony > Expert Witnesses > General Overview

**HN28** An expert qualified by knowledge, skill, experience, training, or education may testify as to scientific, technical, or other specialized knowledge if it will assist the trier of fact to understand the evidence or determine a fact in issue. *Tex. R. Evid. 702*.

Evidence > Types of Evidence > Testimony > General Overview

Evidence > ... > Testimony > Expert Witnesses > General Overview

Evidence > Admissibility > Expert Witnesses > Helpfulness

**HN29** Every licensed doctor is not automatically qualified to testify as an expert on every medical question. Nevertheless, the fact that an expert is not a specialist in the particular branch of medicine for which the testimony is offered will not automatically disqualify him as an expert. The question to be resolved is the specific subject matter and the expert's familiarity with it. The proponent of the expert bears the burden of showing that the expert's testimony is qualified, relevant to the issues, based on a reliable foundation, and will assist the trier of fact.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Evidence > ... > Testimony > Expert Witnesses > General Overview

*HN30* An appellate court reviews a ruling of a trial court as to the qualifications of an expert witness under an abuse of discretion standard.

**Counsel:** R. Brent Cooper, Michelle E. Robberson, Diana L. Faust, Cooper & Scully, Dallas, TX.

Kevin H. Dubose, Hogan Dubose & Townsend, Houston, TX.

Thomas S. Hornbuckle, Stephen S. Hornbuckle, Houston, TX.

**Judges:** PANEL E, Before QUINN and REAVIS, JJ., and BOYD, S.J. [1]

**Opinion by:** John T. Boyd

# Opinion

[*218] Appellees Deborah Freeman (Freeman), Denise Corbello and Lynette Calvert, the daughters of Wanda Granger (Granger), sued appellants Cresthaven Nursing Residence (Cresthaven) and its owner Cantex Healthcare Centers d/b/a Cresthaven Nursing Residence (Cantex) [2] for damages resulting from the care and treatment Granger received while a resident of Cresthaven, which allegedly resulted in her death on July 20, 1996. A jury found that [*219] Cresthaven negligently caused injury and death to Granger and awarded $ 4.5 million in survival damages and $ 4.5 million in wrongful death damages. There was no finding of gross negligence. The court signed a judgment awarding all three appellants $ 6,051,259.20 in damages jointly and severally from Cresthaven, Cantex, and the five general partners of Cantex. That judgment has resulted in this appeal by all parties.

[**2] In eight issues, appellants claim (1) the judgment erroneously awarded damages exceeding the statutory limit on civil liability in section 11.01(a) of *article 4590i of the Texas Revised Civil Statutes*; (2) the judgment erroneously awarded damages to Lynette Calvert and Denise Corbello, who had non-suited with prejudice all their claims against appellants; (3) the judgment erroneously awarded damages against Cresthaven and

the five general partners of Cantex because there was no evidence presented of their liability and there were no affirmative jury findings of liability against them; (4) the trial court erred in submitting a spoliation instruction in the jury charge because the three elements of a spoliation complaint were not established and Cresthaven rebutted the spoliation presumption with a reasonable explanation; (5) the damages awarded for the survival action are excessive and not supported by factually sufficient evidence; (6) the damages awarded for the wrongful death action are excessive and not supported by factually sufficient evidence; (7) the trial court erred in admitting the testimony of appellees' medical expert because he was not [**3] qualified to render expert medical opinions on the issues in this case; and (8) there is no evidence to establish the standard of care, breach of the standard and proximate causation.

Appellees, as cross-appellants, contend that (1) the benefits of article 4590i do not extend to general partners who have admitted they are not health care providers; and (2) even if article 4590i is applicable to the general partners, the damage cap amount should by multiplied by the number of defendants, which would include the general partners.

This lawsuit was brought as a health care liability claim under the Medical Liability and Insurance Improvement Act, *article 4590i of the Texas Revised Civil Statutes.* *HN1* Under that statute, there is a cap on damages recoverable from a health care provider. *HN2* Specifically, the statute provides:

(a) In an action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability for damages of the physician or health care provider shall be limited to an amount not to exceed $ 500,000.

*Tex. Rev. Civ. Stat. Ann. art. 4590i § 11.02 (a)* [**4] (Vernon Supp. 1999). *HN3* The cap is further subject to a consumer price index adjustment. *Id.* § 11.04. The cap applies to both wrongful death and survival actions. *Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 902, 43 Tex. Sup. Ct. J. 1151 (Tex. 2000); Rose v. Doctors Hosp., 801 S.W.2d 841, 848, 34 Tex. Sup. Ct.*

---

[1] John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (Vernon Supp. 2003).

[2] The five general partners of Cantex Healthcare Centers are the remaining appellees, Bratex, Inc., Gamtex, Inc., Medco Medical Services, Ontex, Inc., and Amlon U.S.A., Inc.

J. 177 (Tex. 1990). It is the interpretation of this provision and its applicability to the judgment in this lawsuit that is the subject of dispute between the parties.

Appellants allege in their first issue that the trial court awarded damages that exceeded the civil liability cap. They contend that the trial court should have limited damages to one cap, including prejudgment interest computed at the time the judgment was signed or $ 1,413,008.13. Alternatively, if prejudgment interest is not appropriately included in the liability cap, the judgment should have included prejudgment interest computed on the amount of capped damages, the judgment [*220] should not have included prejudgment interest on the wrongful death damages, and accrual of prejudgment interest should have been tolled by lengthy periods of delay caused by appellees. The cross-issues of appellees are related [**5] to these arguments, and we will address them in our discussion of these matters.

Appellants initially argue that, because the liability of only one defendant, Cresthaven, was submitted to the jury, the judgment is limited to a single cap. *HN4* It has been held that the damages provision is to be applied on a "per defendant" basis. *Rose, 801 S.W.2d at 847*. Thus, a plaintiff who recovers against more than one defendant may obtain a judgment in excess of the cap as long as the combined statutory liability of all defendants is not exceeded. *Id.* Further, the cap applicable to a single defendant who is jointly and severally liable in a comparative negligence situation is not increased by the number of culpable defendants. *Columbia Hosp. Corp. of Houston v. Moore, 43 S.W.3d 553, 556* (Tex.App.--Houston [1st Dist.] 2001, pet. granted).

Conversely, appellees argue in response to this issue and also in their first cross-issue that, because the five general partners of the owner and operator of the nursing home have admitted they are not health care providers, they are not entitled to the protection of the cap. Alternatively, even if the cap is available to [**6] all of the defendants, there are six culpable defendants against whom the court has rendered judgment, and therefore the cap should be multiplied by six. This is so, appellees posit, because it is not necessary for the defendant to have been found liable by a jury for a defendant to be culpable pursuant to the judgment.

Only the issue of Cresthaven's negligence was submitted to the jury. However, the judgment recites that appellees may recover jointly and severally from Cresthaven, Cantex, and the five general partners of Cantex. While appellees assert that Cantex is liable because it is the owner and operator of Cresthaven, they do not contend that both Cantex and Cresthaven are culpable defendants, even though the jury found Cresthaven to be negligent and judgment was rendered against both parties. Therefore, appellees apparently recognize that Cresthaven and Cantex are not two separate legal entities, and Cantex is responsible for the liabilities of Cresthaven because Cantex did business as Cresthaven.

As noted, appellees did not seek recovery against the general partners in their pleadings as joint tortfeasors, and no issue as to the negligence of the general partners was submitted [**7] to the jury. Therefore, even if the general partners have judicially admitted that they are not health care providers, as appellees contend, it is irrelevant since appellees did not seek damages from the general partners on the basis that they were health care providers. The basis upon which appellees sought damages against the general partners, and upon which the judgment against them was entered, is that *HN5* statutory law imposes joint and several liability on general partners for the debts and obligations of a partnership making them vicariously liable. *Tex. Rev. Civ. Stat. Ann. art. 6132b-3.04*. Vicarious liability is a judicially created vehicle for enforcing remedies for wrongs. *Dutcher v. Owens, 647 S.W.2d 948, 950-51, 26 Tex. Sup. Ct. J. 289 (Tex. 1983)*. It is the imposition of liability on one party for the actionable conduct of another based on a relationship between the parties. Black's Law Dictionary 1566 (6th ed. 1990). No liability under the law was imposed on the general partners independent of their status as a partner.

[*221] Therefore, the general partners can only be liable for the debt incurred by Cantex d/b/a Cresthaven. It is appropriate to [**8] include them in the judgment, but not to increase the amount of the judgment by treating each general partner as a tortfeasor in its own right. We believe this interpretation is consistent with the *HN6* stated purposes of the Medical Liability and Insurance Improvement Act, one of which is to decrease the cost of claims and assure that awards are rationally related to actual damages. See *Tex. Rev. Civ. Stat. Ann. art. 4590i § 1.02(b)(2)* (Vernon Supp. 1999). Otherwise, the amount of an award against a health care provider could be doubled simply by the fact it has four general partners instead of two. Thus, the judgment is limited by a single cap of $ 500,000 adjusted by the consumer price index.

Appellants also contend that prejudgment interest is included within the section 11.02 cap on damages. This question has not been definitively answered by the Texas Supreme Court. In *Auld,* the court concluded that prejudgment interest under the general prejudgment interest statute [3] was included in the damages cap. *Auld, 34 S.W.3d at 900-01*. However, the majority opinion specifically declined to address whether sections 16.01 and 16.02 of article 4590i, **[**9]** added in 1995, conflict with this interpretation. *HN7* Pursuant to section 16.02, judgments must include prejudgment interest on past damages found by the trier of fact, but are not to include prejudgment interest on future damages. *Tex. Rev. Civ. Stat. Ann. art. 4590i § 16.02(b)* (Vernon Supp. 1999). Nevertheless, in a concurring and dissenting opinion, four justices indicated their belief that this section confirms that prejudgment interest is not subject to the cap. *Auld, 34 S.W.3d at 908*. More recently, the Houston Court of Appeals ruled that the majority opinion in *Auld* with respect to prejudgment interest under the general statute was not binding when prejudgment interest was awarded under the more recent provisions of the Medical Liability and Insurance Improvement Act, which shows a legislative intent to exclude prejudgment interest from the cap. *Moore, 43 S.W.3d at 562*.

 **[**10]** We agree with the Houston court that the holding in *Auld* is not binding, and we must determine the effect of the legislature having added Subchapter P dealing with prejudgment interest to the act and reconcile it with the liability limits in Subchapter K. We note initially that section 11.02 of Subchapter K *HN8* states that where final judgment is rendered against a physician or health care provider, "the limit of civil liability for damages of the physician or health care provider shall be limited to an amount not to exceed $ 500,000." Thus, the cap applies to damages, not the amount of the judgment. Further, the cap does not include the amount of damages awarded on claims for necessary medical, hospital, and custodial care. Tex. Rev. Civ. Stat. Ann. § 11.02(b) (Vernon Supp. 1999). However, in Subchapter P, section 16.02 *HN9* provides that the judgment must include prejudgment interest on past damages, but shall not include prejudgment interest on future damages. *Id.* § 16.02(b). Thus, it seems clear that the legislature intended to make a distinction between damages awarded and the final judgment by providing that the cap applies to the damages **[**11]** awarded, but prejudgment interest on past damages must be included

in the judgment. Further, if the legislature had intended the cap to apply to prejudgment **[*222]** interest, it would surely have made that provision. We believe this is a logical interpretation of the act relying on the language used in the act. Thus, we find that *HN10* prejudgment interest is not included in the statutory cap on damages.

We must next determine whether prejudgment interest is calculated on the capped or uncapped amount of damages. *HN11* The statute provides that prejudgment interest shall be paid on past damages found by the trier of fact, but not on future damages. Past damages are defined as those awarded to compensate the claimant for their loss incurred from the period beginning on the date of injury and ending on the day before the date of judgment. *Id.* § 16.02(d)(1).

Appellees contend that, because the statutory language provides that prejudgment interest is to be paid on damages found "by the trier of fact," prejudgment interest should be calculated on that amount awarded before application of the damages cap and cite to *Moore* in support of that proposition. However, the court held that prejudgment interest **[**12]** is not included in the damages cap and is recoverable on all damages. *Moore, 43 S.W.3d at 562*. However, that statement was, as noted, made within the context of whether prejudgment interest was included within the cap. Therefore, the court was merely stating that prejudgment interest is owed, even though it exceeds the amount authorized by the damages cap and should be paid on all damages, both those covered and not covered by the cap, *i.e.*, medical, hospital, and custodial care.

The issue in the other two cases cited by appellees, *Samples v. Graham, 76 S.W.3d 615* (Tex.App.--Corpus Christi, 2002, no pet. h.) and *Battaglia v. Alexander, 2002 Tex. App. LEXIS 2938, 2002 WL 730530* (Tex.App.--Houston [14th Dist.] April 25, 2002, no pet. h.), was whether prejudgment interest should be awarded on past damages found by the trier of fact prior to a deduction for settlement credits. In both cases, the courts found that the deduction for settlement credits should be made after calculation of prejudgment interest on the amount awarded by the jury. However, we note that in *Graham*, the court stated that prejudgment interest is included **[**13]** in the statutory cap and refused to find that "allowing prevailing plaintiffs to recover prejudgment interest only on a statutorily limited

---

[3]    Tex. Rev. Civ. Stat. Ann. art. 5069-1.05, section 6(a) now codified as Tex. Fin. Code 304.102 (Vernon Supp. 2003).

measure of past damages found by the jury presents an absurd scenario." (Emphasis added). *Graham, 76 S.W.3d at 621*.

Nevertheless, we must assume the legislature intended the plain meaning of its words and, if possible, ascertain their intent from the language used in the statute. *National Liability & Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527, 43 Tex. Sup. Ct. J. 690 (Tex. 2000)*. **HN12** The legislature did not provide that prejudgment interest is to be awarded on the amount of past damages included in the judgment, but on the amount awarded by the trier of fact. This language implies that prejudgment interest is applicable on the full amount of past damages found by the jury prior to the application of the liability cap, which determines the amount for which the defendant is liable in the judgment. We therefore interpret the statute to require calculation of prejudgment interest on the amount of damages found by the jury.

In light of that finding, appellants argue that appellees are limited to prejudgment interest on the amount of damages **[**14]** awarded by the jury for the survival claims because appellees did not request segregation of past and future damages with respect to their wrongful death claims. Appellants and appellees agree that the amount awarded as survival damages constitutes past damages. Essentially, the only disputed issue between the parties is **[*223]** which of them had the burden of requesting segregation of the wrongful death damages. Appellants argue that, under the law, the burden is on the plaintiff. Conversely, appellees argue that, because appellants pled the statutory limitation on prejudgment interest as an affirmative defense, they had the burden to request segregation.

**HN13** The statute clearly provides that prejudgment interest is not to be awarded on future damages. Appellees have cited no authority stating that to be entitled to the benefit of this statute, a defendant must assert it as an affirmative defense in his pleading. However, it has been held that **HN14** the burden of segregating past and future damages is on the party seeking to obtain prejudgment interest. *Cavnar v. Quality Control Parking, Inc., 696 S.W.2d 549, 556, 28 Tex. Sup. Ct. J. 466 (Tex. 1985)*; *Domingues v. City of San Antonio, 985 S.W.2d 505, 511* (Tex.App.--San Antonio 1998, pet. denied). **[**15]** This is so because it is fair to place the burden of submitting a proper jury charge on the party to whom the benefit of the charge will result. *Id*. Because appellees did not submit a charge segregating past damages from future damages, no

prejudgment interest is available on the wrongful death damages awarded.

Finally, appellants contend with respect to prejudgment interest that the award should be reduced for periods of delay caused by appellees. **HN15** Prejudgment interest is to be computed in accordance with the Texas Finance Code. *See* Tex. Rev. Civ. Stat Ann. § 16.02(c) (Vernon Supp. 1999). **HN16** Under *section 304.108(a)*, a court may consider the periods of delay in the trial and order that prejudgment interest does not accrue during them. *Tex. Fin. Code Ann. § 304.108* (Vernon Supp. 2003). However, prejudgment interest is to be denied only for delays caused by the parties and not a crowded trial docket. *Purcell Constr. Inc. v. Welch, 17 S.W.3d 398, 403* (Tex.App.--Houston [1st Dist.] 2000, no pet.). **HN17** We review a court's refusal to offset prejudgment interest **[**16]** under an abuse of discretion standard. *Helena Chemical Co. v. Wilkins, 18 S.W.3d 744, 760* (Tex. App.-- San Antonio 2000), *aff'd*, *47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675 (Tex. 2001)*; *City of Alamo v. Casas, 960 S.W.2d 240, 260* (Tex.App.--Corpus Christi 1997, pet. denied).

Appellants argue that the court should have granted an offset from appellees first request for continuance on October 1, 1998, to the date of the fifth trial setting when the case actually went to trial on May 7, 2001. They base this contention on their claim that appellees did not promptly pursue a speedy resolution of their claims by requesting at least four continuances.

While this case took almost five years to come to trial, the clerk's record reveals only three motions for continuance by appellees and only one of those motions was opposed by appellants. If appellants felt that appellees were unnecessarily delaying the trial, they could have been more proactive in seeking and holding appellees to a trial setting. **HN18** It has been held not to be an abuse of discretion to refuse to make an offset against prejudgment interest when one motion for continuance was granted at one party's request, **[**17]** another motion for continuance was granted at the other party's request, and one was granted pursuant to a joint motion. *Aquila Southwest Pipeline, Inc. v. Harmony Exploration, Inc., 48 S.W.3d 225, 244* (Tex.App.--San Antonio 2001, pet. denied). Under the record before us, we cannot say the trial court abused its discretion in refusing to offset prejudgment interest. In summary, we sustained in part and overruled in part appellants' first issue. In doing so, we found that the judgment should be calculated based on a single

statutory cap adjusted by the consumer price index and [*224] that prejudgment interest should be calculated on the award of survival damages only. We also overrule appellees' cross-issues.

In their second issue, appellants argue that the judgment improperly included Denise Corbello and Lynette Calvert, as heirs at law of the Estate of Wanda Granger because they non-suited their claims with prejudice against appellants prior to trial. Appellees respond that Corbello and Calvert only non-suited their individual claims against appellants, not their survival claims. Thus, they assert, because the judgment only awards them damages as heirs at law, the judgment [**18] does not include improper plaintiffs.

Corbello and Calvert sued both on an individual basis and as heirs at law of Granger's estate. The notice of non-suit was brought by them only in their individual capacities. Further, it specifically states that the non-suit "is only being taken as to individual claims made on the part of DENISE CORBELLO AND LYNETTE CALVERT and not as to any claims made by the Estate of Wanda Granger."

Appellants appear to contend that because Corbello and Calvert did not appear at trial and no claims were submitted by them in the charge to the jury, the judgment is in error. However, the jury was asked what sum of money would fairly and reasonably compensate Granger for pain and mental anguish. This question represents the claim for survival damages which is the claim brought by Granger's estate. Because the claims of Corbello and Calvert, as heirs at law of Granger's estate were not non-suited, this question represents their claims. Appellants' second issue is overruled.

By way of their third issue, appellants contend that the trial court erred in awarding judgment against Cresthaven and the five general partners. Appellants object to the inclusion of the [**19] general partners because no evidence was submitted to support the liability of the general partners and the jury made no finding of liability for them. We have already discussed this issue with respect to whether there should be a single cap on damages. It was because there was no assertion or finding of liability against the partners independent of their status as general partners that we

concluded that a single cap should apply. However, we also concluded that it was appropriate to include the general partners in the judgment because, under the law, they have joint and several liability for the debts of the partnership.

Appellants argue that, in the last live pleading by appellees, they only alleged that "the corporate partners were responsible for the management and operation of Cresthaven Nursing Residence, that each of the corporate partners were general partners of Cantex Healthcare Centers, and that the corporate partners were jointly and severally liable for the acts and omissions of the employees of Cresthaven." Appellants now appear to be arguing that these allegations are asserting claims against the general partners arising under the law independent of their status as [**20] general partners and, because they filed a verified denial of these allegations and no evidence of negligence of the general partners was submitted at trial, they are improperly included in the judgment.

As already stated, we interpret these allegations as asserting a claim against the general partners based only on their status as general partners, which we believe is supported by the fact that no evidence was introduced at trial as to their individual negligence and no issue submitted to the jury with respect to any such negligence. Even if the allegations included [*225] independent individual liability for which no findings were made by the jury, those facts would not obviate the statutory mandate which holds the general partners liable. The general partners were named as parties to the lawsuit and, under the law, they are jointly and severally liable for the debt owed under the judgment by Cantex. Thus, it is appropriate to include them in the judgment.

Appellants have failed to present any argument or authorities as to why Cresthaven should not be included in the judgment. Therefore, nothing is presented for review. [4] *Dunlap v. Excel Corp., 30 S.W.3d 427, 434* (Tex. App.--Amarillo 2000, no pet.); [**21] *Jefferson County Drainage Dist. No. 6 v. Lower Neches Valley Authority, 876 S.W.2d 940, 953* (Tex. App.--Beaumont 1994, writ denied). We overrule appellants' third issue.

In their fourth issue, appellants complain of the trial court's error in submitting a spoliation instruction to the

---

[4] We would tend to agree that it was unnecessary to include Cresthaven in the judgment. However, because there is no evidence that Cresthaven and Cantex are separate legal entities, we fail to see any harm in its inclusion in the judgment to, and appellants have not asserted any such harm.

jury, which probably caused the rendition of an improper judgment. The instruction given by the court was as follows:

You are instructed that, when a party has possession of a piece of evidence at a time he knows or should have known it will be evidence in a controversy, and thereafter he disposes of it, alters it, makes it unavailable, or fails to produce it, there is a presumption in law that the [**22] piece of evidence, had it been produced, would have been unfavorable to the party who did not produce it. If you find by a preponderance of the evidence that Cresthaven Nursing Residence had possession of original, unaltered nurses notes pertaining to Wanda Granger at a time it knew or should have known they would be evidence in this controversy, then there is a presumption that the original, unaltered nurses notes pertaining to Wanda Granger, if produced, would be unfavorable to Cresthaven Nursing Residence. This presumption may be rebutted by Cresthaven Nursing Residence with the evidence of a reasonable explanation for the non-production of the evidence. [5]

**HN19** The doctrine of spoliation [**23] refers to the improper intentional destruction of evidence relevant to a case. *See Malone v. Foster, 956 S.W.2d 573, 577* (Tex.App.--Dallas 1997), *aff'd, 977 S.W.2d 562 (Tex. 1998)*. Trial courts have broad discretion to take measures to correct the ill effects resulting from spoliation, including a jury instruction on the spoliation presumption and death penalty sanctions. *Trevino v. Ortega, 969 S.W.2d 950, 953, 41 Tex. Sup. Ct. J. 907 (Tex. 1998)*. In making that determination, appellants urge reliance on the factors set forth in Justice Baker's concurring opinion in *Trevino,* which are (1) whether there was a duty to preserve evidence, (2) whether the alleged spoliator negligently or intentionally spoliated evidence, and (3) whether the spoliation prejudiced the nonspoliator's ability to present its case. *Id. at 954-55*. Several courts have adopted these factors in their analysis of the propriety of an instruction. *See White-side v. Watson, 12 S.W.3d 614, 621-22* (Tex. App.--Eastland 2000, pet. denied); **[*226]** *Offshore Pipelines, Inc. v. Schooley, 984 S.W.2d 654, 667-68* (Tex.App.--Houston [1st Dist.] 1998, no pet.).

**[**24]** **HN20** A party may have a statutory, regulatory or ethical duty to preserve evidence. *Trevino, 969 S.W.2d at 955*. **HN21** A party also has a duty to preserve relevant evidence once litigation arises, and a duty to exercise reasonable care to preserve relevant evidence if it actually or reasonably should anticipate litigation. *See Wal-Mart Stores, Inc. v. Johnson, 39 S.W.3d 729, 730, 732* (Tex.App.--Beaumont 2001, pet. granted).

The evidence shows that Granger had been a resident of the nursing home since February 1995. On July 5, 1996, she was admitted to the hospital with a broken femur. She returned to Cresthaven on July 8, 1996, but was readmitted to the hospital on July 19 after vomiting dried blood. She died the next day. On July 20, just hours prior to the death of her mother, Freeman visited the nursing home seeking information as to her mother's condition in the days prior to her hospitalization and requested a copy of her mother's records. From this evidence, the trial court could have concluded that there was a duty on the part of Cresthaven to preserve those records.

The evidence further shows that on July 20, one of the nurses, Gloria Thompson, **[**25]** was asked by Joan Adams, the assistant director of nursing, to recopy a July 19 entry in her nursing notes with respect to Granger. The original note was apparently given to Adams, but was not available at trial. However, Thompson testified that she recopied her note verbatim and there is no evidence to the contrary. [6] She additionally stated that everything in the note was accurate and based on her personal observations.

Late entries were also made in the records of Granger although they were not noted as such. There is some evidence that Adams may have told Thompson and Cynthia Arceneaux that the chart was not completely documented and information needed to be filled in. However, none of the persons making those entries testified that they provided false information. [7] There was also testimony that there were times when the staff was so busy with resident care that they did not have

---

[5] Appellants also complain that the instruction did not assist the jury, but confused and misled them and improperly shifted the burden of proof. However, in their reply brief, they clarify that these complaints are raised only to show the harm suffered from the instruction, not as a direct attack on the instruction itself.

[6] There is no explanation as to why she was asked to recopy that particular note.

[7] Tashia Essex testified at trial that she was asked to fill in information for days she did not work, but admitted that in her deposition she had testified she was only asked to fill in information for days that she did work. No explanation for this inconsistency is provided.

time to complete their records on their **[\*\*26]** shift and completed them later.

In addition to these acts, appellees claim that they established that (1) medical records are missing notes from the charge nurse for several shifts during a critical period of Granger's care, (2) intake/outflow records for the entire month of July are missing, (3) nurses were directed to fill in missing portions of the medical record, and (4) catheter care was given by a medication aide who could not give catheter care. However, the pages cited in the record with respect to the missing notes from the nurse only establish that one nurse, Maridel Potato Meja, and Thompson herself did not know where Thompson's notes were, if she had in fact worked on July 16. It does not prove that the notes ever existed **[\*\*27]** or that either person was responsible for being the custodian of those records. Further, the evidence shows that intake/outflow sheets were not placed by Granger's bed, which is evidence that the documents never existed.

**[\*227]** Entries in the records for July 12 through July 19 show that Granger was eating 100% of her food, although nurse's aide Essex testified she was not eating much, if anything. Freeman also stated that, although records indicate that her mother was talking and asking for food that week, from her own personal observations her mother was not responding to questions or eating. It is not established if these inconsistencies are the result of false records or if there are other explanations such as differences in the time of observation. There is also evidence that entries in care were initially made for one or more days when Granger was in the hospital, although some of these were later scratched out. Once again, the record does not affirmatively establish if these incorrect records are the result of deliberate falsification or honest mistakes. As to catheter care, Arceneaux denied that the initials which looked like "C. A." next to catheter care were hers, and no explanation **[\*\*28]** for who performed the catheter care was provided.

Kenneth Blanda, administrator of Cresthaven, testified that he had not been aware at the time it happened that any entries had been made late or recopied. Further, there was no directive from upper managment, he averred, for them to "get those records straight" or make sure there were no blanks in the record. He denied that the records had been falsified and stated that as far as he knew, they were accurate. However, he admitted that a notation should have been made of any late entry.

*HN22* The deliberate spoliation of evidence relevant to a case raises the presumption that the evidence would have been unfavorable to the cause of the spoliator. *Ordonez v. M. W. McCurdy & Co., Inc., 984 S.W.2d 264, 273* (Tex.App.--Houston [1st Dist.] 1998, no pet.); *Wal-Mart Stores, Inc. v. Middleton, 982 S.W.2d 468, 470* (Tex.App.--San Antonio 1998, pet. denied); *Brewer v. Dowling, 862 S.W.2d 156, 159* (Tex. App.--Fort Worth 1993, writ denied). The presumption may be rebutted with a showing that the evidence was not destroyed with a fraudulent intent or purpose. *Hight v. Dublin Veterinary Clinic, 22 S.W.3d 614, 619* (Tex.App.--Eastland 2000, pet. denied). **[\*\*29]** The presumption does not apply when documents are merely lost. *Williford Energy Co. v. Submergible Cable Services, Inc., 895 S.W.2d 379, 389-90* (Tex.App.--Amarillo 1994, no pet.).

*HN23* A trial court must submit in the charge to the jury all questions, instructions, and definitions raised by the pleadings and the evidence. *Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez, 995 S.W.2d 661, 663, 42 Tex. Sup. Ct. J. 738 (Tex. 1999)*. If the instruction might aid the jury in answering the issues presented or if there is any support in the evidence for the instruction, it is proper. *Knighten v. Louisiana Pacific Corp., 946 S.W.2d 638, 642* (Tex.App.-- Beaumont 1997), *rev'd on other grounds, 976 S.W.2d 674 (Tex. 1998)*.

We will assume that the purported alteration of records can satisfy the requirement of destroyed evidence. However, the evidence with respect to the rewriting of Thompson's nurse's notes for July 19 does not show that there was any false information or that any prejudice resulted to appellees as a result of the rewriting of those notes. The same is true with respect to any late entries made to the **[\*\*30]** nursing home records except for the inconsistent testimony of Essex as to whether she was asked to make late entries for any days that she did not actually work. Further, the evidence as to the intake/outflow records is that they never existed, which may be evidence of negligent care, but not of spoliation of evidence.

**[\*228]** Thus, the only evidence that might raise the issue of spoliation is the inconsistent testimony of Essex as to whether she was asked to make late entries for days that she did not actually work, inconsistencies between nurse's records showing the patient was eating and talking in the days before her death and the testimony of a nurse's aide and the patient's daughter which stated she was not, and Thompson's notes for

July 16, which may be missing but were not shown conclusively to have actually existed. Although not particularly strong, these facts rise to a scintilla of evidence which would support the giving of the instruction within the discretion afforded to the trial judge. Further, if the medical records were altered to show that the patient was eating and talking in the days before her death when, in fact, she was not, that information could have constituted **[**31]** some evidence that the nursing home was aware she had a bladder infection which continued to worsen, thereby resulting in her death, according to appellees' theory of the case. Appellants' fourth issue is overruled.

In their fifth and sixth issues, appellants claim the damages awarded arising out of both the survival claim and wrongful death claim are excessive and not supported by factually sufficient evidence. Therefore, they assert, they are entitled to a new trial or, alternatively, this court should suggest a remittitur of damages.

*HN24* In determining whether damages are excessive, the court should use the same test as that for a factual sufficiency question. *Pope v. Moore, 711 S.W.2d 622, 624, 29 Tex. Sup. Ct. J. 412 (Tex. 1986)*. Thus, we must consider and weigh all of the evidence and should set aside the award only if the challenged finding of fact is so contrary to the overwhelming weight of the evidence as to be manifestly unjust. *In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661-62 (1951)*. The mere fact that an award is large does not show that the jury was influenced by passion, prejudice, sympathy, or other circumstances not in evidence, and the award must **[**32]** be flagrantly outrageous, extravagant, and so excessive that it shocks the judicial conscience. *Missouri Pacific R. Co. v. Roberson, 25 S.W.3d 251, 257-58* (Tex. App.--Beaumont 2000, no pet.).

The jury was asked what sum of money would have fairly and reasonably compensated Granger for pain and mental anguish, which was defined as the conscious physical pain and emotional pain, torment, and suffering experienced by her before her death as a result of the occurrence in question. The jury found that $ 4.5 million would so compensate her.

In *Saenz v. Fidelity & Guaranty Ins. Underwriters, 925 S.W.2d 607, 39 Tex. Sup. Ct. J. 743 (Tex. 1996)*, it was

held that *HN25* mental anguish must be "a high degree of mental pain and distress" and must necessarily involve more than mere worry, anxiety, vexation, embarrassment, or anger. *Id. at 614*. While juries must be afforded discretion in arriving at the determination of a figure for which there is no exact evaluation, there must be some evidence to justify the amount awarded, and juries cannot simply pick a number. *Id.*

At the time of her admission to the nursing home, Granger suffered from Alzheimer's Disease, organic **[**33]** brain syndrome, decreased functional activity, diabetes, hypertension, and urinary tract infections. During the time relevant to this lawsuit, there was testimony that Granger suffered from pain as a result of a broken leg on July 4, 1996, prior to her death on July 20, 1996. This apparently occurred as a result of two employees attempting to move her to her bed when she fell, collapsed or was **[*229]** dropped. [8] The nursing home records show that immediately after her fall, Granger was asked if she had any problems, and she replied negatively. However, the pain from the broken leg was described by her daughter as "excruciating," in spite of pain medication. The pain would be exacerbated by being moved by nursing home personnel, although Freeman also complained that her mother was in pain because she would be left in one position too long. There is further evidence that Granger may have been despondent, lacking an appetite, and producing cloudy and unpleasant smelling urine through her catheter during this time period, although Freeman stated that she did not notice any foul odors when she visited. Additionally, there was some testimony from Freeman that, at one time when she asked the staff **[**34]** to clean up her mother, it was discovered that her mother was lying in caked feces. Further, she was vomiting on July 19 prior to her admission to the hospital. After she had been admitted to the hospital on July 19, her daughter described her as shaking and non-responsive, although hospital records described her as alert, awake, not running a temperature, and having no speech problem. However, her condition worsened within hours after admission to the hospital, and she died, according to appellees, from sepsis occurring as a result of an untreated bladder infection. Nevertheless, appellants presented autopsy evidence that her death was the result of coronary artery sclerosis due to a pinpoint narrowing of one of her arteries.

---

[8] The nursing home records show that Granger had a fainting episode, although Freeman stated she did not believe that to be true. There is evidence that Granger was obese and weighed 295 pounds at the time of admission to the nursing home.

In examining the excessiveness of the damages [**35] awarded, the holdings in two cases out of the same court provide some guidance. In *Casteel v. Crown Life Ins. Co., 3 S.W.3d 582* (Tex.App.--Austin 1997), *rev'd in part on other grounds, 22 S.W.3d 378, 43 Tex. Sup. Ct. J. 348 (Tex. 2000)*, the plaintiff was awarded $ 6,000,000 for past mental anguish as a result of his claim for damages resulting from a misrepresentation of an insurance agent that the obligation to pay premiums under a policy would eventually vanish. The plaintiff testified that he lost business, friends, and his reputation due to the dispute, he required psychiatric treatment and medications due to stress, he suffered short and long term memory loss, and he had attempted suicide due to depression. His wife also testified about the effect of the dispute on his life. However, the court found that although the evidence supported a finding that he suffered from past mental anguish, nothing in the record showed that $ 6,000,000 was reasonable compensation for that anguish. *Id. at 593*.

In *Rehabilitation Facility at Austin, Inc. v. Cooper, 962 S.W.2d 151* (Tex.App.--Austin 1998, no pet.), a 71-year-old woman suffering from rheumatoid [**36] arthritis and osteoporosis was being moved from a wheelchair to her hospital bed when she experienced great pain, became nauseous, and blacked out. It was discovered several hours later that two bones had been broken in her right leg. The next day, after further complaints of pain, it was discovered that two bones in her left leg were also broken. She spent two months in full leg casts. Although she had not been able to walk prior to the incident, after the incident she was unable to stand even with a walker and could not sit for more than 20 minutes at a time. The rest of the time she was prone and could no longer enjoy car rides with her son. She [*230] experienced pain at the fracture sites and became depressed. There was also testimony that her chances of living as long as she might have were decreased. In finding that she had been deprived of what little hope and independence she had, the court held that the evidence supported an award of $ 1,235,000 for pain, mental anguish and physical impairment alone. *Id. at 155*.

Although there is evidence that Granger suffered pain between July 4 and July 20 as a result of breaking a bone in her leg, she may have been depressed, [**37] lacking an appetite, and may not have been timely washed after having defecated in her bed on one occasion, there is nothing in the evidence to support an award of $ 4.5 million. There is no evidence that, if indeed she was producing abnormal urine in the days preceding her death, she was even aware of that fact or that it caused her worry or pain. Further, because such a short time occurred between the incident where her leg was broken and her sudden deterioration and death, there is no evidence as to how the broken leg might have affected her long term physical and mental prognosis. We do not believe the record supports an award of $ 4.5 million for Granger's physical pain and mental anguish. We therefore suggest a remittitur in the amount of $ 3.5 million in that regard. Having sustained appellants' fifth issue to that extent, if a remittitur is not voluntarily filed, then a new trial should be granted.

The jury was also asked what sum of money would fairly and reasonably compensate Freeman for her damages, if any, resulting from the death of her mother. In making that decision, the jury was instructed to consider loss of companionship and society, meaning the loss of positive [**38] benefits flowing from the love, comfort, companionship, and society that she would have received from her mother if she had lived, and mental anguish, meaning the emotional pain, torment, and suffering experienced by Freeman because of the death of her mother. The jury was allowed to consider the relationship between Freeman and her mother, their living arrangements, any extended absences from one another, the harmony of their relations, and their common interests and activities. The jury awarded $ 4.5 million, the same amount awarded as survival damages.

Freeman offered the following testimony with respect to her feelings on the death of her mother:

A. It was horrible. I was shocked, hurt, saddened. My kids were all upset. You know, we loved my mama a whole lot; and she loved us.

Q. Did it come too quickly for you, ma'am?

A. Of course. I never dreamed, never, that my mother would go in a hospital on a Friday and be dead on a Saturday.

Q. Do you feel a loss?

A. Terribly.

Q. And on top of that do you feel that you have been misled by this nursing home?

A. Totally.

Q. And let down?

A. Yes.

Q. Did you love your mother as much as any child could love a mother?

A. I loved my [**39] mother with all my heart, and my kids loved my mother with all their hearts.

Q. You feel like they have taken away years that you otherwise could have had, such as a Mother's Day yesterday?

A. Yes.

Q. And I'm sorry to be testifying for you, but I'm going to let you tell the [*231] jury something and that is what you feel.

A. I didn't get to tell her "goodbye."

(Weeping) My kids didn't get to tell her "goodbye."

We didn't get to say those things that we needed to say. And we looked forward to the holidays. We still talk about it. We eat food, and I fix certain kinds of things my mother liked to eat. They would always say, "That's grandma's - - you know, "That's what she liked."

We would bring her food, and my kids enjoyed my mother. And they told her things that went on with the day. She took lots of time with them. And they miss her, and I miss her. And it's like every holiday we miss my mother.

And the way - - and the way she died is just like - - it's horrible. Nobody should have had to suffer like that, nobody. And I hope that nobody's mother or anybody else has to suffer ever what I feel in my heart.

There was additional testimony that Granger had suffered from nervous breakdowns [**40] throughout her life and that Freeman and her sister had been raised by others while her mother was in and out of hospitals. Granger had also been unable to raise a younger half-sister. As an adult, Freeman built a relationship with her mother. Beginning in 1987, Granger lived in her daughter's home, but Freeman became unable to physically care for her mother's needs, particularly those related to her catheter, and placed her in the nursing home in 1995. During her stay at the nursing home,

Granger had periods of time in which her mental status was altered.

In *Russell v. Ramirez, 949 S.W.2d 480* (Tex.App.--Houston [14th Dist.] 1997, no writ), the court found an award of $ 750,000 for mental anguish and loss of the companionship of the plaintiff's 16-year-old son to be supported by the evidence. *Id. at 487*. In doing so, the court noted the plaintiff was a single parent and her son had lived at home at the time of his death, there was evidence that they did a lot of activities together such as skating, going to the mall, to movies and to Astroworld, there was a videotape of him dancing with his mother shortly before his death, the plaintiff stayed [**41] with her son at the hospital for 12 days before he died and, even though she was advised he would not recover, she talked to him and prayed for him, she still goes to his grave two or three times a week to tell him she misses him, she places a memorial to him in the newspaper every year, and she testified she has never stopped grieving for him. *Id. at 486-87*.

*HN26* No physical manifestation of mental anguish is necessary in wrongful death cases, and the issue can be submitted to the jury on the basis of the impact suggested by the circumstances surrounding the loss. *Moore v. Lillebo, 722 S.W.2d 683, 687-88, 29 Tex. Sup. Ct. J. 513 (Tex. 1986)*. From the evidence presented, a rational trier of fact could have found that, at the time of her death, the relationship between Freeman and her mother was close, and they had lived together happily for eight years until Freeman could no longer care for her mother who, by the time of her admission to the nursing home, had significant health problems. However, throughout her life, Freeman and her mother had been separated for extended periods of time, and there is little or no evidence of common interests or activities.

We believe in this [**42] instance the amount of the award is not supported by the evidence. We therefore sustain appellants' sixth issue and suggest a remittitur of $ 3 million in that regard. In the event the [*232] remittitur is not voluntarily made, the matter will be reversed for a new trial.

Appellants complain in their eighth issue that the trial court abused its discretion in admitting the testimony of appellees' medical expert, Dr. J. D. Britton, because he was not qualified to render an expert opinion on the issues in this case relating to urology, cardiology, and pathology.

Dr. Britton testified he was a family practitioner for approximately nine years. During that time, he was a medical director of a nursing home in Austin for almost seven years. Then, he moved to Houston and began a residency program in occupational medicine for two years. He obtained a master's degree in public health and completed his training in occupational medicine. He has since been in private practice in occupational medicine. Dr. Britton is certified in preventive medicine with occupational medicine as a specialty and board eligible in family practice, meaning he has not taken the final exam to be certified. His experience **[\*\*43]** in the areas of urology, cardiology, and pathology are from medical school and his subsequent internship, as well as having treated patients with urological and cardiac problems.

With respect to the care of Granger, he testified there was evidence that she was suffering from a bladder infection and that the nursing home staff had failed to give her antibiotics, even though they had been prescribed, which was negligence. She was known to have frequent urinary infections, had been treated with antibiotics for over a year and when the antibiotics ceased, she still had a "smoldering infection." He further stated that weakness resulting from her infection would have contributed to her fall, resulting in a broken leg. When Granger was admitted to the hospital with her broken leg, her white cell count indicated an infection, which was untreated from July 1 through July 20. On admission to the hospital on July 19, her white cell count also indicated a severe infection. In the emergency room on July 19, she was diagnosed with gastrointestinal bleeding, but later in intensive care, a nurse reported that there was pus coming out of her bladder. There were also dark clots of urine which would **[\*\*44]** indicate the urinary tract was bleeding.

According to Dr. Britton, this infection entered into Granger's bloodstream and sepsis resulted in her death. He further opined that sepsis can shut down any vital organ including the heart, resulting in sudden heart failure. Also, the stress of infection and the pain of a broken leg could have caused heart failure. The fact that she had no temperature is not indicative that she had no infection, because the elderly can have subnormal or normal temperature when they have an infection, and a severe infection can cause intestinal bleeding. He further stated that as of 11:00 p.m. on July 19, the information available, including the fact she was elderly with gastrointestinal bleeding, a white cell count of 27,000, IV fluids needing to be administered, her

blood pressure dropping and increased pulse and respiratory rates, indicated she was septic. By the time antibiotics were given, it was too late.

According to Britton, Granger had three kinds of bacteria that are common in persons with catheters for a long period of time. The bacteria are easily treated if done so promptly. If the hospital had received accurate records as to the nature of Granger's **[\*\*45]** urine, her lack of input and output, and her non-responsiveness prior to admission to the hospital, proper treatment could have saved her life.

Dr. Britton found it to be a breach of the standard of care for a nurse to not follow up on an order for an antibiotic, thereby discontinuing its use and that was **[\*233]** a proximate cause of injury. Further, the nursing home was grossly negligent, in his opinion, in their awareness of certain problems about which nothing was done, such as having no intake/outflow records. The failure of the nursing home to communicate Granger's problems to the hospital was reasonably certain to have caused her death.

*HN27* In a medical malpractice case, the plaintiff must establish a duty requiring the defendants to conform to a certain standard of conduct, the applicable standard of care and its breach, a resulting injury, and a reasonably close causal connection between the breach of the standard of care and the injury. *Blan v. Ali, 7 S.W.3d 741, 744* (Tex. App.-- Houston [14th Dist.] 1999, no pet.). Expert testimony is necessary to meet this burden. *Id. HN28* An expert qualified by knowledge, skill, experience, training, or education may testify as **[\*\*46]** to scientific, technical, or other specialized knowledge if it will assist the trier of fact to understand the evidence or determine a fact in issue. *Tex. R. Evid. 702*.

However, *HN29* every licensed doctor is not automatically qualified to testify as an expert on every medical question. *Broders v. Heise, 924 S.W.2d 148, 152, 39 Tex. Sup. Ct. J. 752 (Tex. 1996)*. Nevertheless, the fact that an expert is not a specialist in the particular branch of medicine for which the testimony is offered will not automatically disqualify him as an expert. *Ali, 7 S.W.3d at 745*. The question to be resolved is the specific subject matter and the expert's familiarity with it. *See Heise, 924 S.W.2d at 153*; *Ali, 7 S.W.3d at 745*. The proponent of the expert bears the burden of showing that the expert's testimony is qualified, relevant to the issues, based on a reliable foundation, and will assist

the trier of fact. *E. I. du Pont de Nemours and Co., Inc. v. Robinson, 923 S.W.2d 549, 556, 38 Tex. Sup. Ct. J. 852 (Tex. 1995)*. **HN30** We review the ruling of the trial court as to the qualifications of an expert witness under an abuse of discretion standard. *Heise, 924 S.W.2d at 151*.

 [**47]  Appellants complain that Dr. Britton was not qualified by education, training, knowledge, or experience in the fields of urology, cardiology, or pathology, which would qualify him to make a diagnosis of sepsis or urosepsis or to render opinions that the same were the proximate cause of Granger's broken leg, heart failure, and/or death. This is primarily so because his only training or experience in those fields occurred in medical school or in his practice of family medicine, which ended in 1984. Therefore, his opinions were mere speculation.

The focus of our determination is not on the doctor's area of expertise, but on the condition involved in the claim. *Ali, 7 S.W.3d at 746*. If Dr. Britton is offering opinions peculiar only to the fields of urology, cardiology, and pathology, then he is unqualified to render them. However, if the standards of care he discusses apply to any physician or health care provider who treats an elderly patient with long term catheter care and cardiology problems, then his lack of expertise in those special fields is irrelevant. *See id. at 747*.

Dr. Britton's opinions as to the negligence of the nursing home involved [**48]  the failure to give an antibiotic that had been prescribed for a urinary tract infection, to maintain accurate information in nursing home records and to communicate that information to hospital personnel upon transfer of a patient to the hospital. The standard of care with respect to these actions are common to all patients in a nursing home and, further, Dr. Britton had experience as a nursing home director.

 [*234]  As to the cause of death, Dr. Britton relied on his medical training and general experience treating patients. He further researched reference articles with respect to sepsis and the conditions which indicate its manifestation and also an article on precipitating causes of heart failure. Moreover, one of the consulting hospital physicians for Granger on June 20, a cardiologist, gave his impression of her condition as "hypotension and shock, probably secondary to sepsis, probably urosepsis and urinary tract infection." Additionally, her attending physician at the time of her death, a doctor of osteopathy, listed one of the causes of death on her death certificate as sepsis. [9] Thus, there is nothing to indicate that the opinions offered required an expertise peculiar to the [**49]  fields of cardiology or urology. Further, multiple doctors who are not pathologists offered opinions as to the cause of Granger's death. The trial court did not abuse its discretion in allowing Dr. Britton to testify. Appellants' seventh issue is overruled.

In their eighth issue, appellants argue that because Dr. Britton's testimony was not competent, the record contains no evidence to establish the standard of care, breach of that standard, or proximate causation. However, we have found Dr. Britton's testimony to have been admissible, and thus there was some evidence on all three elements of appellees' claims. It was up to the jury to assign whatever credibility they chose to that testimony. We therefore also overrule appellants' eighth issue.

Summarized, we overrule [**50]  appellants' second, third, fourth, seventh and eighth issues and appellees' two cross-issues. We sustain in part appellants' first issue by finding that the damages should be limited to a single statutory cap. Prejudgment interest is not subject to the cap and should be computed on the amount of survival damages alone. We also sustain appellants' fifth and sixth issues. If the suggested remittiturs are not voluntarily made within a period of 45 days from the date of this opinion, this cause will be reversed and remanded for a new trial. If the remittiturs are made within that time, the cause will be affirmed.

John T. Boyd

Senior Justice

---

[9]  At trial, he changed his opinion of the cause of her death based on the autopsy report, which found the cause to have been coronary arteriosclerosis. He also stated that the consulting cardiac physician now believes her death was cardiac-related.