

# NUMBER 13-20-00097-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

GANADO NURSING AND
REHABILITATION CENTER, INC.
AND TAG MGT SERVICES, LLC,                                    Appellants,

v.

AMALIA POULTON, INDIVIDUALLY
AND AS REPRESENTATIVE OF THE
ESTATE OF FRANCES GARCIA,
AND JESSE GOMEZ,                                             Appellees.

On appeal from the 135th District Court
of Jackson County, Texas.

# MEMORANDUM OPINION

Before Chief Justice Contreras and Justice Longoria and Perkes
Memorandum Opinion by Justice Perkes

This is an interlocutory appeal of the trial court's order denying the motion of appellants, Ganado Nursing and Rehabilitation Center, Inc. and Tag Mgt Services, LLC, to dismiss the health care liability claims of appellees, Amalia Poulton, individually and as representative of the estate of Frances Garcia, and Jesse Gomez. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 51.014(a)(9), 74.351(a), (b). By what we construe as two issues, appellants argue that (1) the trial court abused its discretion in overruling appellants' objections to appellees' Chapter 74 report and supplemental report and denying appellants' motions to dismiss, and (2) the trial court abused its discretion by allowing appellees the opportunity to cure deficiencies in the original expert report. We affirm.

## I.  BACKGROUND

In the early morning hours of November 13, 2016, 73-year-old Garcia fell while at the Ganado Rehabilitation facility. Facility notes indicate that at 4:30 a.m., a nurse checked Garcia's blood pressure and administered medication for hypertension. At approximately 5:08 a.m., a nurse found Garcia "kneeling on [the] floor beside [the] bed." The nurse noted a "large knot from [Garcia's] eye to [the] top of [her] r[igh]t forehead" and, after first assisting Garcia up to a lying position, left Garcia's room to retrieve ice. Garcia reportedly told the nurse that she fell while "leaning on [the] bedside table."[1] At 6:29 a.m., a nurse recorded the following notation:

> CALLED FOR CRASH CART AND TO CALL EMS. STAFF TO ROOM TO ASSIST. RESIDENT NON[-]RESPONSIVE. SHE DID SLIGHTLY RESPOND WHEN SHERRI RUBBED HER CHEST. BLOOD SUGAR TAKEN 292, O2 SAT 96%. EMS IN BUILDING. REPORT GIVEN. SCARRASC [sic] OUT TO CALL DAUGHTER. EMS STATED PUPILS NOT RESPONDING. ASSIST ONTO STRETCHER WITH X 3 [sic]. RESIDENT OUT OF BUILDING. I CALLED ROBERT TO INFORM OF TRANSFER.

---

[1] This was Garcia's third fall since arriving at the nursing home on October 12, 2016. The first two falls occurred on October 20 and October 28; Garcia did not receive medical evaluation following either fall.

NATHAN FROM [CITIZENS MEDICAL CENTER] ER CALLED. REPORT GIVEN. INFORMED THAT EMS LEFT APPROX. 6AM.

Garcia was evaluated, intubated, and put on a ventilator at Citizens Medical Center in Victoria before being transferred to San Antonio Medical Center for a neurosurgical evaluation. Garcia died two days later on November 15, 2016.

On November 8, 2018, appellees filed suit alleging that, by failing to properly provide "a safe environment for [Garcia] while [she was] in their care," "[b]y failing to properly provide timely medical treatment following the fall," and "[b]y failing to properly diagnose and recognize the serious nature of the injury sustained," appellants "were negligent and such negligence was the proximate cause of [Garcia's] injuries and untimely death."

On March 21, 2019, appellees filed their Chapter 74 expert report of Truman J. Milling Jr., M.D. *See id.* § 74.351. In preparing for his report, Dr. Milling noted that he reviewed Garcia's medical records from the hospital but stated that he "did not receive any documentation from the nursing home or from the continuing care at the San Antonio hospital." On April 8, 2019, appellants objected to Dr. Milling's qualifications and to his report on the grounds that Dr. Milling's opinions regarding standard of care, breach, and causation were conclusory and speculative.

On May 3, 2019, appellees filed an "addendum to [Dr. Milling's] report on the care of Frances Garcia after having been provided with the nursing home records and [appellants'] Motion to Dismiss." Dr. Milling opined, in part, that the nursing home records substantiated his initial findings, and he expounded on his expertise in the claim.

On May 20, 2019, appellees filed a motion to strike appellants' objections to the Chapter 74 expert report and response to appellants' objections and motion to dismiss.

3

Appellants thereafter filed supplemental Chapter 74 objections and a reply to appellees' response. Appellants argued that while "the gist of the claims against Defendants, both from the Petition and as set forth in Dr. Milling's reports, is that Defendants' staff should have called 911 'immediately' and arranged for a transfer of the resident to the hospital earlier," the reports fail to show "how and why this resident would have had a better outcome if there had not been a short delay in transfer." Appellants also disputed the timeline of events provided by Dr. Milling.

On June 21, 2019, the trial court granted appellees a thirty-day extension to cure deficiencies in their Chapter 74 filing,[2] and appellees filed the supplemental Chapter 74 expert report of Dani Bidros, M.D., on July 18, 2019.

On July 26, 2019, appellants filed objections to Dr. Bidros's qualifications and report and a second motion to dismiss. Appellants argued no curriculum vitae (CV) was served, *see id*. § 74.351(a), and regardless, Dr. Bidros, a neurosurgeon, was not qualified to opine on the standard of care or breach of a nursing home. *See id*. § 74.402(b). Appellants also objected that Dr. Bidros was not provided and did not review relevant records from the nursing facility or San Antonio facility and instead, based her opinion on records from Citizen's Medical Center and Dr. Milling's report. Finally, appellants asserted Dr. Bidros's report does not contain an opinion on the standard of care required, aver that appellants breached the standard of care, or establish a causal connection between an unstated breach of the standard of care and the injuries sustained. Appellees filed Dr. Bidros's CV on August 1, 2019.

---

[2] The trial court order did not specify what deficiencies it found in the original expert report.

4

On January 22, 2020, the trial court denied appellants' objections to appellees' expert reports and its motions to dismiss. This interlocutory appeal followed. *See id.* § 51.014(a)(9) (providing for interlocutory appeal of the denial of a motion to dismiss a healthcare liability claim based on a deficient expert report).

## II.    DISCUSSION

Appellants' objections to the qualifications of Dr. Milling and Dr. Bidros and to their opinions regarding all three statutory elements—standard of care, breach, and causation—are nearly identical. However, their reports differ in detail. We will address appellants' objections by expert, beginning with the challenge to the expert's qualifications and proceeding to each of the statutory elements.

## A.    General Authority & Standard of Review

To avoid dismissal under Chapter 74, a health care liability claimant must file an expert report within 120 days after the defendant answers the suit. *Id.* § 74.351(a). An "expert report" is a written report by an expert that provides a fair summary of the expert's opinions "regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6); *see Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013). Notwithstanding the fact that Chapter 74 speaks only of a "causal relationship" and does not refer to "proximate cause," the Texas Supreme Court has held that an expert report must explain how and why the defendant's breach *proximately* caused the plaintiff's injury. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017) ("[A] plaintiff asserting a health care liability claim based on negligence, who cannot

5

prove that her injury was proximately caused by the defendant's failure to meet applicable standards of care, does not have a meritorious claim."). To satisfy Chapter 74 with respect to proximate causation, the expert need not use any particular words, such as "proximate cause," "foreseeability," or "cause in fact"; however, the expert's explanation of the plaintiff's injuries must be more than a mere conclusory assertion. *Id*. The expert must "explain the basis of his statements to link his conclusions to the facts." *Id.*; *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010); *see also Zamarripa v. Columbia Valley Health Care Sys., L.P.*, No. 13-18-00231-CV, 2019 WL 962085, at *3 (Tex. App.—Corpus Christi–Edinburg Feb. 28, 2019, pet. denied) (mem. op.).

When a report and CV are timely served on a defendant, any objections to the sufficiency of the report and any objections to the expert's qualifications must be raised by the defendant within twenty-one days after service of the report and CV. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a).

A trial court's ruling on the sufficiency of an expert's report is reviewed for an abuse of discretion. *Baty v. Futrell*, 543 S.W.3d 689, 693 (Tex. 2018). Under this review, we defer to the trial court's factual determinations if they are supported by the evidence but review its legal determinations de novo. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam). A trial court abuses its discretion if it acts without reference to guiding rules or principles. *Id.* In exercising its discretion, it is incumbent upon the trial court to review the reports, sort out their content, resolve any inconsistencies, and decide whether the reports demonstrate a good faith effort to show that the plaintiff's claims have merit. *See id.* at 144; TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the

6

court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report."). To qualify as an objective good faith effort, the report must provide enough information regarding the expert's opinions on the three statutory elements of standard of care, breach, and causation to fulfill two purposes: (1) inform the defendant of the specific conduct the plaintiff questions, and (2) provide a basis for the trial court to conclude that the plaintiff's claims have merit. *See Jelinek*, 328 S.W.3d at 538–40 & n.9; *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878–79 (Tex. 2001); *McAllen Hosps., L.P. v. Gonzalez*, 566 S.W.3d 451, 456 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.). "Whether this [expert's] explanation is believable should be litigated at a later stage of the proceedings." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 226 (Tex. 2018) (per curiam).

## B.    Qualifications

To opine on the standard of care applicable to a non-physician healthcare provider, such as appellants, an expert must meet the qualifications of § 74.402. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(B). Subsections 74.402(b) and (c) provide the following qualifications for an expert:

> (b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:
>
>> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, *if the defendant health care provider is an individual*, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
>>
>> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

7

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2) is actively practicing health care in rendering health care services relevant to the claim.

*Id.* § 74.402(b), (c) (emphasis added). Appellants are not individuals; thus, § 74.402(b)(1) does not apply. *See id.* § 74.402(b)(1); *see also Christus Spohn Health Sys. Corp. v. Alaniz*, No. 13-17-00590-CV, 2018 WL 3673013, at *3 (Tex. App.—Corpus Christi–Edinburg Aug. 2, 2018, no pet.) (mem. op.) (finding the same); *Doctors Hosp. v. Hernandez*, No. 01-10-00270-CV, 2010 WL 4121678, at *4–5 (Tex. App.—Houston [1st Dist.] Oct. 21, 2010, no pet.) (mem. op.) (same).

Dr. Milling is board certified in emergency medicine and completed his emergency medicine residency at New York Methodist Hospital in 2005, serving as chief resident. For the past thirteen years, Dr. Milling has worked at "Dell Seton Medical Center at the University of Texas Austin (formerly Brackenridge Hospital), a level one trauma center, comprehensive stroke center and the primary teaching hospital for the Dell Medical School at the University of Texas Austin," where he also "routinely teach[es] medical students, residents[,] and fellows to diagnose and treat head injuries." Dr. Milling has also "published data on intracranial hemorrhage in all its variations including subdural hematomas, most recently in the New England Journal of Medicine."

8

In the trial court, appellants objected to Dr. Miller's qualifications on the following grounds:

The report and CV do not show any qualifications under Texas law to address the standard of care for or breach of the standard of care by a nursing home or its parent company. Dr. Milling's report and CV reflect no education, no training and no experience in nursing home care. Finally, Dr. Milling's report and CV reflect no qualifications to opine on the causal connection between a nursing home's alleged negligence and the brain injury and/or death [sic] this case.

. . . .

Further, there is no overlap between the disciplines; there is nothing in either his report or his CV to show that Dr. Milling has ever

- provided nursing or other care to a resident in a nursing home such as Ganado Nursing and Rehabilitation;

- provided "proper care and protection" to a nursing home resident;

- worked in a nursing home to "guard against the foreseeable consequences of the patient's injury, condition, or treatment[;]"

- had to "exercise the degree of care, skill, supervision, and diligence ordinarily possessed and used by other providers under the same or similar circumstances" in a nursing home facility[;]

- provided "skilled care and treatment" in a facility to a resident such as Decedent[;]

- determined whether or when a nursing home resident needs "timely … [sic] medically treatment or transportation to an appropriate facility or medical treatment or transportation to an appropriate facility for treatment[;]"

- "properly monitor[ed]" a resident of a nursing home facility while in his care "so as to not cause her to fall to the ground, and to subsequently provide proper and timely medical care."

9

Appellants additionally argue Dr. Milling inappropriately "opines about delays in neurosurgical evaluation and possible surgical evacuation of the subdural hematoma, as well as herniation syndrome, and gives the opinion that earlier intervention would have improved the outcome," despite demonstrating "no experience or expertise in neurosurgery generally or evaluation and surgical evacuation of subdural hematomas or treatment (if any) of herniation syndrome specifically."

Contrary to appellants' assertions, subsection 74.402(b)(1) does not require that Dr. Milling be "practicing health care in a field of practice that involves the same type of care or treatment as that delivered by" appellants—i.e., a nursing home—because appellants are not individuals. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(1); *see also Alaniz*, 2018 WL 3673013, at *3; *Hernandez*, 2010 WL 4121678, at *4–5. Thus, the proper inquiry is not whether Dr. Milling has worked in or provided care at a nursing home. Rather, the relevant question is whether he possesses the knowledge, skill, experience, training, or education regarding the fundamental principles of the claim raised. *See Cresthaven Nursing Residence v. Freeman*, 134 S.W.3d 214, 233–34 (Tex. App.—Amarillo 2003, no pet.); *see also IHS Acquisition No. 140, Inc. v. Travis*, No. 13-07-00481-CV, 2008 WL 1822780, at *5 (Tex. App.—Corpus Christi–Edinburg Apr. 24, 2008, pet. denied) (mem. op.) (concluding that an expert certified in geriatrics and "knowledgeable about the types of people who reside in nursing homes, their afflictions, and most importantly, the relevant treatment and standard of care for such patients," was qualified to testify to the standard of care applicable in a claim against a nursing home for failure to monitor a resident's eye injury despite never having worked in a nursing home).

10

The "illness, injury, or condition" at the crux of the claim here is a fall resulting in a head injury, and the lawsuit concerns whether appellees failed to properly provide timely medical treatment following the fall and failed to properly diagnose and recognize the serious nature of the injury.[3]

Dr. Milling's expert report read in relevant part:

My opinions are based on my training, qualifications and active practice in the specialty of emergency medicine for the past 13 years, now and at the time of the events in question. . . . Briefly, my qualifications are as follows. I am a certified emergency physician by the American Board of Medical Specialties/American Board of Emergency Medicine. . . . My primary practice site for the past 13 years has been Dell Seton Medical Center at the University of Texas Austin (formerly Brackenridge Hospital), a level one trauma center, comprehensive stroke center and the primary teaching hospital for the Dell Medical School at the University of Texas Austin, and I serve on the Seton Network Stroke Operations Council. I routinely teach medical students, residents and fellows to diagnose and treat head injuries.

. . . .

There is significant overlap between emergency department care and nursing home care, particularly in regards to head injury and who should be further evaluated. And fall prevention, falls and the triage decision of who needs further evaluation are a part of any medical specialty that cares for patients in beds, i.e. nearly all of them. And they all refer those fall patients to the emergency department and emergency physicians for further evaluation.

There was also some concern regarding my expertise in neurosurgical intervention. I have published data on intracranial hemorrhage in all its variations including subdural hematomas, most recently in the New England

---

[3] We observe that neither of appellees' expert reports address whether appellants were negligent by failing to provide Garcia with "a safe environment," as alleged in appellees' live petition. Instead, the reports concern appellants' response to Garcia's alleged fall—i.e., appellants alleged failure to "properly provide timely medical treatment following the fall" and "diagnose and recognize the serious nature of the injury sustained." *See McAllen Hosps., L.P. v. Gonzalez*, 566 S.W.3d 451, 457–58 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.) (noting that "an expert report that adequately addresses at least one pleaded liability theory against a defendant is enough to defeat that defendant's motion to dismiss under the expert report rule"); *SCC Partners, Inc. v. Ince*, 496 S.W.3d 111, 114–15 (Tex. App.—Fort Worth 2016, pet dism'd) (providing that "if at least one alleged claim, theory, or cause of action in a healthcare liability suit has expert support, then the legislative intent of deterring frivolous suits has been satisfied"); *see also Matagorda Nursing & Rehab. Ctr., L.L.C. v. Brooks*, No. 13-16-00266-CV, 2017 WL 127867, at *6 (Tex. App.—Corpus Christi–Edinburg Jan. 12, 2017, no pet.) (mem. op.).

Journal of Medicine. While I do not perform craniotomies myself, I am well versed in the indications and outcomes. Care of the brain injured patient is multi-disciplinary, including emergency physicians, neurosurgeons, neurologists and critical care specialists.

Dr. Milling's report demonstrates experience in rendering health care services relevant to the claim—the diagnosis and treatment of head injuries. *See Christian Care Centers, Inc. v. Golenko*, 328 S.W.3d 637, 644 (Tex. App.—Dallas 2010, pet. denied) ("The essential claim in this case involves the standard of care applicable to the assessment and care of individuals with Alzheimer's disease. Thus, the relevant question is not the narrow issue of whether Dr. Rushing has worked in a nursing home."); *Freeman,* 134 S.W.3d at 233–34 (holding that a physician who practiced occupational medicine was qualified to opine on nursing home care, not because he was knowledgeable about nursing home care per se, but because he was knowledgeable about the type of injury that the nursing home patient had suffered—a urinary tract infection—and how it would affect the patient); *see also IHS Acquisition*, 2008 WL 1822780, at *5; *Nexion Health at Beechnut, Inc. v. Moreno*, No. 01-15-00793-CV, 2016 WL 1377899, at *5 (Tex. App.—Houston [1st Dist.] Mar. 29, 2016, no pet.) (mem. op.). The trial court did not abuse its discretion in implicitly determining that Dr. Milling "has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(2).

The next applicable statutory requirement is that Dr. Milling be "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care." *See id.* § 74.402(b)(3). In assessing a physician's "training or experience" a court must look to whether the expert is certified by a licensing agency and is actively practicing health care in rendering health care services relevant to the claim.

12

*Id.* § 74.402(b)(3), (c). Dr. Milling's report and CV demonstrate he is certified by an appropriate licensing agency and has had substantial training and experience in the relevant health care area. *See id.*; *see also IHS Acquisition*, 2008 WL 1822780, at *5. The trial court did not abuse its discretion in implicitly determining that Dr. Milling satisfied this statutory requirement.

## C.     Expert Report Elements

Appellants also contend that the trial court abused its discretion in denying their motion to dismiss on the ground that the reports of Drs. Milling and Bidros convey only impermissibly conclusory and speculative opinions regarding the (1) standard of care, (2) breach, and (3) causation.

Dr. Milling opined in part:

According to the emergency physician's note, Ms. Garcia fell at 4:30 a.m., Nov. 13, 2016, hitting her head on a hard surface and losing consciousness from the impact, but she was "initially fine" though she complained of a headache, and staff found her obtunded at 6 a.m. The radiologist's report puts the fall at 4 a.m. and notes family found her at 6 a.m. unconscious with dilated pupils.

The patient had a fairly extensive medical history, most notably end stage renal disease requiring hemodialysis, which would have caused uremic platelet dysfunction and increased her risk of bleeding even from minor trauma. This was acknowledged in the medical record by treatment with Desmopressin (also called DDAVP), which enhances platelet adhesion and decreases bleeding time in uremia. It is unclear what happened during the either a 1.5- or 2-hour gap between the injury and the discovery of her neurologic deterioration at the nursing home. The statement, second hand though it is, that she was "initially fine" would seem to indicate someone at the nursing home was aware of the fall. Someone at the nursing home called 911 after the 6 a.m. discovery, but by the time Ms. Garcia arrived in the emergency department[,] her neurologic status was worsening, her Glasgow Coma Scale (GCS) was 6, and she was intubated and put on a ventilator. She had a moderate sized hematoma to her right temporal scalp, per the emergency physician's and nurses' notes. A CT scan of her head showed a large (25 mm) right subdural hematoma (SDH) pushing the brain to the left (midline shift of 14 mm). At this point the patient had multiple

13

indications for emergent neurosurgical intervention, e.g. greater than or equal to 10 mm width and 5 mm midline shift is a generally accepted indication among others.

The emergency physician arranged to transfer the patient to San Antonio for neurosurgical evaluation presumably because he did not have a neurosurgeon on call at his facility. Given the appearance of the bleeding on her CT scan, the size of the subdural hematoma and the amount it had shifted the brain inside the skull, along with her vital signs of hypertension and bradycardia, the so-called "Cushing's Response" and her comatose state, it is likely she was already suffering a fatal brain herniation syndrome before leaving for San Antonio for neurosurgical evaluation. I was provided with Ms. Garcia's death certificate dated Nov. 15, 2016, indicating she died from complications of injuries sustained in a fall.

. . .

Older head injury patients are more likely to be admitted to the hospital and more likely to die. This increased morbidity and mortality is due both to the fragility of age and also the development of co-morbid conditions that either intrinsically increase the risk of bleeding, e.g. renal failure and cerebral atrophy, or require the use of medications that increase that risk, e.g. antiplatelet and anticoagulant medications. Given this well understood increased risk, it is routine to see elderly nursing home patients sent to the emergency department for evaluation of even minor head trauma. Given this standard, it is difficult to understand and explain the 1.5 to 2[-]hour gap from the point of Ms. Garcia's fall to the discovery of her worsened neurologic status. From the medical records it appeared she had a significant head trauma with a loss of consciousness. The standard for this alone would be to send her to the emergency department for evaluation immediately. She also had platelet dysfunction for her renal failure, which made her high risk for intracranial hemorrhage. Without a compelling explanation for the delay, this would be a breach in the standard of care that caused harm for two primary reasons, i.e. delay in neurosurgical evaluation and possible evacuation of the subdural hematoma and delay in treatment of her platelet dysfunction which might have lessened hematoma expansion and possibly prevented the herniation syndrome that led to her death. The statement that she was "initially fine" indicates there was a window for these two interventions that had unfortunately closed by the time she was discovered unconscious. It is more likely than not that these interventions if applied earlier in her course would have improved her outcome.

Dr. Milling's "addendum" provided the following:

I emphasize the times because the gap of about an hour and a half represents the breach. Tucking a frail elderly woman, with half her face

14

swollen with hematoma, back into bed with an ice pack is a breach of the medical standard of care and is inferior to what she would likely have received from a bystander on a street corner. This cannot be emphasized enough. It was the failure to recognize the seriousness of this initial injury that was the mistake that in all reasonable medical probability led to Ms. Garcia's death. The injuries along with her comorbidities were more than enough to warrant immediate further evaluation. With regards to clarifying the term "immediate," I mean the time it takes to pick up a phone and dial 911, and I certainly do not mean an hour and half or more. Waiting until the patient deteriorated neurologically made her eventual death inevitable. To suggest that transfer was not indicated until that time is to profoundly misunderstand the mechanism of this disease, a collection of blood around the brain growing and pushing on it until critical structures are irreversibly damaged causing coma and death. It is important not to confuse an immediate and transient loss of consciousness at the time of brain injury (which was described in the emergency department record but not in the nursing home record) with the comatose state she was found in an hour and a half later. Failure to immediately transfer after the first event is the breach in the standard of care that caused harm.

Dr. Milling's standard of care opinions are conclusory, according to objections appellants lodged in the trial court, because

> Dr. Milling provides no specifics about what the standard of care requires for an "immediate transfer" and leaves the Court and Defendants to speculate why transferring the resident after she lost consciousness was somehow not immediate. He does not opine that the patient should have been transferred before she lost consciousness and acknowledges that she was transferred when she did lose consciousness.

Appellants contend that "[s]aying that failure to immediately transfer caused harm is not enough."

However, Dr. Milling unequivocally opines that the standard of care required that the nursing home send Garcia for emergency evaluation "immediately" after her fall—"the time it takes to pick up a phone and dial 911, and I certainly do not mean an hour and half or more." We have previously held that an expert's proffered opinion on a failure to abide by an articulated time frame was a sufficient expression of the standard of care. *See Alaniz*, 2018 WL 3673013, at *7. Appellants' breach, according to Dr. Milling, was their

15

failure to send Garcia for emergency evaluation immediately after the fall. And as a consequence, Dr. Milling opined that "[w]aiting until the patient deteriorated neurologically made her eventual death inevitable." In other words, Dr. Milling's report explained how and why he thought appellants breached the standard of care, explained the basis of his statements and linked his conclusions to specific facts that occurred, and explained why the appellants' actions led to the harm and ultimate death of Garcia. *See Abshire*, 563 S.W.3d at 226 (holding that with respect to causation, our "role is to determine whether the expert has explained how the negligent conduct caused the injury"); *Miller*, 536 S.W.3d at 512 (holding that that there was a "more-than-adequate summary" of causation where the expert explained how the physician's breach—failing to identify the illness—delayed timely removal, which in turn caused the patient to aspirate); *see also Norberg v. Ameel*, No. 13-18-00165-CV, 2019 WL 6906559, at *5 (Tex. App.—Corpus Christi–Edinburg Dec. 19, 2019, pet. denied) (mem. op.). Accordingly, the report advises appellants of the specific conduct appellees have called into question and provides the trial court a basis for it to conclude that the claims have merit. *See Miller*, 536 S.W.3d at 513. "Additional detail is simply not required at this stage of the proceedings." *Baty*, 543 S.W.3d at 697.

We conclude that Dr. Milling's report was sufficient to qualify as a "good-faith" effort to comply with the causation requirement under § 74.351. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351; *see also Abshire*, 563 S.W.3d at 224; *Gonzalez*, 566 S.W.3d at 455–57 ("[A]n expert report is a low threshold a person bringing a claim against a health care provider must cross merely to show that his or her claim is not frivolous." (citing *Loaisiga v. Cerda*, 379 S.W.3d 248, 264 (Tex. 2012))). We, therefore, hold the trial court

16

did not abuse its discretion in granting appellees' motion for a thirty-day extension nor in denying appellants' motions to dismiss. We overrule appellants' first and second issues.[4]

### III. CONCLUSION

We affirm the ruling of the trial court.

GREGORY T. PERKES
Justice

Delivered and filed the
1st day of October, 2020.

---

[4] Appellants also challenged Dr. Bidros's expert report by arguing that Dr. Bidros is not qualified and the report did not comply with § 74.351. Because we determined that Dr. Milling's expert report complies with § 74.351, we do not need to address appellants' complaints regarding Dr. Bidros's as those complaints are not dispositive. *See* TEX. R. APP. P. 47.1; TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (providing that an expert report "is not admissible in evidence by any party; shall not be used in a deposition, trial, or other proceeding; and shall not be referred to by any party during the course of the action for any purpose"); *see also see also Norberg v. Ameel*, No. 13-18-00165-CV, 2019 WL 6906559, at *6 (Tex. App.—Corpus Christi–Edinburg Dec. 19, 2019, pet. denied) (mem. op.).

17